IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

  Plaintiff,

vs.                    No.  CR-03-2112 MV

JORGE TORRES-LARANEGA, et al.,

  Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Jorge Torres-Laranega's Motion to Suppress Statements and Evidence **[Doc. No. 304]**, filed September 15, 2004, and Defendant Jose Francisco Diaz's Notice of Joinder **[Doc. No. 323]**, filed October 5, 2004. The Court, having considered the motions, briefs, relevant law and being otherwise fully informed, finds that Torres-Laranega's Motion to Suppress Statements and Evidence is not well taken and will be **DENIED**.

## BACKGROUND

Torres-Laranega testified that, on the morning of November 19, 2003, he was having breakfast with his father, Romualdo Torres-Duarte, when Yolanda Alarcon, who is the confidential informant in this case, called and asked him to meet her and her son, Guillermo Verdugo, in El Paso. According to Torres-Laranega, he and his father went to downtown El Paso and met Alarcon and Verdugo on the street. Also according to Torres-Laranega, Alarcon dialed her cell phone and asked Torres-Laranega to take the telephone and talk to Jose Francisco Diaz. Torres-Laranega testified that he told her to hang up, which she did.

According to Torres-Laranega, as he, his father, Alarcon and Verdugo were walking down the street, several unmarked vehicles and an El Paso police vehicle stopped around them and

individuals who were not in uniform and did not identify themselves came out of the cars, pointed guns at them and told them to get on the ground. Torres-Laranega testified that he was asked to get up and lift his shirt and pants leg and then was handcuffed and thrown to the ground. Torres-Laranega also testified that he saw his father take out his medication so the officers could search his stomach area and then be placed in handcuffs and thrown to the ground.

According to Torres-Laranega, the officers directed him to sit on the sidewalk where he waited for approximately twenty or twenty five minutes until an FBI agent arrived. Also according to Torres-Laranega, his father, too, was sitting on the sidewalk but they were not allowed to talk to each other. Torres-Laranega testified that he was concerned for his father because he suffers from "many illnesses" including heart condition and diabetes. Special Agent Rene Medina testified that Torres-Laranega's arrest occurred at 10:45 a.m. Agent Medina also testified that Torres-Laranega's father, who by his own admission was illegally in the United States, was not actually arrested by the FBI but rather was detained and turned over to the Border Patrol.

Torres-Laranega testified that he, his father, Alarcon and Verdugo were transported in separate cars to the El Paso FBI office and that, once they arrived at the FBI office, each was escorted to a separate room. Torres-Laranega testified that he did not know exactly where his father was being held but that he could hear him coughing. Torres-Laranega testified that he waited in a room where he was handcuffed to a wall for approximately one hour, at which time Agent Medina entered the room, told him that he wanted to speak with him right away and that he was going to take him to another room.

According to Torres-Laranega, Agent Medina returned ten minutes later with Agent Brian Nishida and took him to an office across the hall. Torres-Laranaga testified that Agent Medina first

told Torres-Laranega that if he would call Diaz and tell him to go to a certain place where agents would then go and arrest him, the agents would release his father. According to Torres-Laranega, when he refused, Agent Medina told him that they also had Rebecca Ramirez-Torres in custody and that they would release her if he called Diaz.

Torres-Laranega testified that, at that point, Agent Medina read him his *Miranda* rights in Spanish and asked if he understood what he had just read. Torres-Laranega testified that he replied that he did understand. In addition, Torres-Laranega testified that he himself read aloud the waiver of rights provision on the advice of rights form and then signed it. Torres-Laranega testified that he signed the waiver of rights because he believed that the agents would release his father if he did so. In addition, Torres-Laranega testified that he felt responsible to sign it because the most important thing to him was for his father to be released.

According to Torres-Laranega, at that point, the agents had not informed him of the charges against him or that he had been indicted. Torres-Laranega, however, did testify that the agents played for him a telephone call that involved a drug load that was seized at the Las Cruces border patrol checkpoint. According to Torres-Laranega, Agent Ida D'Antonio joined the interview after he had signed the waiver.

Initially, Torres-Laranega testified that he did not know that he did not have to talk to the agents. Later, however, Torres-Laranega twice testified that he understood the rights set forth in the waiver provision. Torres-Laranega also testified that he understood that he had the right to have an attorney present when he was being questioned.

Agent Medina testified that, at 1:15 p.m., he and Agent Nishida brought Torres-Laranega into an office to interview him and that the interview was conducted in Spanish. Agent Medina testified

that, once they determined that Torres-Laranega primarily spoke Spanish, Agent Ida D'Antonio joined the interview. According to Agent Medina, this happened before Torres-Laranega was read his rights. Agent Medina testified that he gave Torres-Laranega a brief summary of the investigation, including the surveillance the agents had conducted and the recordings made of him, and advised him that he was being charged with a conspiracy charge regarding the transportation of marijuana. Further, Agent Medina testified that he told Torres-Laranega that the agents were going to ask him questions. At that point, Agent Medina testified, he advised Torres-Laranega of his *Miranda* rights by reading those rights in Spanish from an advice of rights form. Agent Medina testified that he then asked Torres-Laranega to read aloud the waiver of rights provision at the bottom of the advice of rights form. According to Agent Medina, Torres-Laranega read the provision aloud in Spanish and told the agents that he was aware of his rights. Agent Medina further testified that he then asked Torres-Laranega if he understood that anything he said could and would be used against him in a court of law and that Torres-Laranega responded that he was aware of that. Torres-Laranega then signed the waiver of rights provision.

Agent Medina testified that, during the interview, Torres-Laranega was not handcuffed, he was given something to eat and drink and was given an opportunity to use the restroom as needed. Further, Agent Medina testified that he was armed but did not display his weapon during the interview and that he did not threaten Torres-Laranaga or make any promises to him. Torres-Laranega testified that the agents treated him well.

According to Torres-Laranega, the interview lasted for no longer than an hour. According to Agent Medina, the interview lasted approximately one and one-half hours. After the interview, Torres-Laranega testified that he was brought back to the room he was in before the interview.

Torres-Laranega testified that the agents did not inform him of what was happening to his father. According to Torres-Laranega, he did not see his father again until he was taken out of the room and transported to the Dona Ana Detention Center at approximately 8:00 p.m. or 9:00 p.m. Agent Medina testified that, after the interview, Torres-Laranega was transported to a detention facility where he was held until his initial appearance before a Magistrate Judge.

On September 15, 2004, Torres-Laranega filed the instant motion seeking to suppress statements and evidence derived from his November 19, 2003 interview. The government filed a response in opposition on September 22, 2004. The Court held an evidentiary hearing on October 6, 2004. At the conclusion of the hearing, the Court took the motion under advisement. On October 15, 2004, the government filed a motion to supplement the record.

## DISCUSSION

First, Torres-Laranega argues that his statement was obtained in violation of his Sixth Amendment rights. In support of this argument, Torres-Laranega states that, after he was indicted, he was arrested by FBI agents who deliberately took him to the El Paso FBI office rather than taking him directly to a detention center with the sole purpose of eliciting a statement from him in the absence of counsel. As a result of the interview, the government obtained statements and evidence concerning his alleged drug trafficking organization and other loads he had previously transported for other individuals.

Next, Torres-Laranega argues that his statement was obtained in violation of his Fifth Amendment rights. Specifically, Torres-Laranega claims that the totality of the circumstances surrounding his arrest and FBI interview demonstrates that his *Miranda* waiver was not voluntary

but rather was the product of coercion by the government. As set forth herein, the Court disagrees with both of Torres-Laranega's arguments.

## I.     **Waiver of Sixth Amendment Right**

The Supreme Court has held "that an accused is denied 'the basic protections' of the Sixth Amendment 'when there [is] used against him at his trial evidence of his own incriminating words, which federal agents . . . deliberately elicited from him after he had been indicted and in the absence of his counsel." *Fellers v. United States*, 124 S. Ct. 1019, 1022 (2004) (citations omitted). The Sixth Amendment, however, does not bar the police from initiating an interview with a defendant once he has been indicted and his Sixth Amendment right to counsel attaches. Rather, as the Supreme Court held in *Patterson v. Illinois*, 487 U.S. 285 (1988), even post-indictment, a defendant's right to counsel means only that if he or she wants the assistance of counsel, the authorities' interview with him or her must stop and further questioning is forbidden unless the defendant calls for such a meeting. *See id.* at 291. The Supreme Court concluded that "[if] an accused 'knowingly and intelligently' [decides to answer questions without the aid of counsel], we see no reason why the uncounseled statements he then makes must be excluded at his trial." *Id.*

In *Patterson*, the Supreme Court resolved the issue of what constitutes an adequate waiver of the Sixth Amendment right to counsel. The Supreme Court rejected the petitioner's argument that questioning him without counsel present violated the Sixth Amendment because he did not validly waive his right to have counsel present during interviews with law enforcement. The Supreme Court stated:

> Since it is clear that after the *Miranda* warnings were given to petitioner, he not only voluntarily answered questions without claiming his right to silence or his right to have a lawyer present to advise him but also executed a written waiver of his right to

>   counsel during questioning, the specific issue posed here is whether this waiver was
>   a "knowing and intelligent" waiver of his Sixth Amendment right.

*Id.* at 292. The Supreme Court answered this question in the affirmative, holding that "an accused who is admonished with the warnings prescribed by this Court in *Miranda* has been sufficiently apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those rights, so that his waiver on this basis will be considered a knowing and intelligent one." *Id.* at 296. Moreover, the Supreme Court held:

>   Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law.

*Id.* at 297 (citation omitted).

Accordingly, in order to determine whether Torres-Laranega's Sixth Amendment rights were violated, the Court must determine whether he was advised of his *Miranda* rights and whether he validly waived those rights before giving his statement to the FBI agents. The validity of Torres-Laranega's waiver of his *Miranda* rights is discussed below.

## II.     Waiver of Fifth Amendment Right

*Miranda* requires that procedural safeguards be administered to a criminal suspect prior to "custodial interrogation." *Miranda v. Arizona*, 384 U.S. 436 (1966). A defendant's statements cannot be used against him unless the government shows that he voluntarily, knowingly and intelligently waived his *Miranda* rights. *See Moran v. Burbine*, 475 U.S. 412, 421 (1986). The government bears the burden of proving a valid waiver by a preponderance of the evidence. *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

The Supreme Court has held that the Court's inquiry into the validity of a waiver of *Miranda* rights has two dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it. Only if "the totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran*, 475 U.S. 412, 421 (1986). A determination of whether the waiver of *Miranda* rights is voluntary, knowing and intelligent thus is based on the totality of the circumstances. Under this approach, the Court must examine "several factors including the characteristics of the suspect, such as his [or her] age, intelligence, and education, and the details of the interrogation, such as whether the suspect was informed of his [or her] rights, the length of the detention and the interrogation, and the use or threat of physical force." *United States v. Nguyen*, 155 F.3d 1219, 1222 (10th Cir. 1998), *cert. denied*, 525 U.S. 1167 (1999). "An express written or oral statement or waiver by a defendant of his right to remain silent or of the right to legal assistance of counsel, though not conclusive, is 'usually strong proof of validity of that waiver.'" *United States v. Hack*, 782 F.2d 862, 866 (10th Cir. 1986) (citation omitted), *cert. denied*, 476 U.S. 1184 (1986).

In the instant case, Torres-Laranega was interviewed by FBI agents on the afternoon of November 19, 2003, after he was arrested that morning. The undisputed facts demonstrate that, before Torres-Laranega made any incriminating statements, Agent Medina read Torres-Laranega his *Miranda* rights in Spanish, Torres-Laranega indicated that he understood his rights, Torres-Laranega himself read aloud the waiver of rights provision and Torres-Laranega signed the waiver of rights provision. Torres-Laranega twice testified that he understood the rights set forth in the waiver

provision and that he understood that he had the right to have an attorney present when he was being questioned. The undisputed evidence also demonstrates that: Torres-Laranega has had nine years of education and can read Spanish; the interview lasted between one hour and one and one-half hours; during the interview, Agent Medina did not display his weapon; and during the interview, Torres-Laranega was not handcuffed, was given something to eat and drink, was given an opportunity to use the restroom as needed and was generally treated well.

In dispute is whether Agent Medina informed Torres-Laranega before he read him his *Miranda* rights of the charges against him. Agent Medina testified that he gave Torres-Laranega a brief summary of the investigation, including the surveillance the agents had conducted and the recordings made of him, and advised him that he was being charged with conspiracy regarding the transportation of marijuana. According to Torres-Laranega, at the point when he was read his rights, he had not been informed of the charges against him or that he had been indicted. Torres-Laranega, however, did testify that the agents played for him a telephone call that involved a drug load that was seized at the Las Cruces border patrol checkpoint.

Also in dispute is whether Agent Medina promised Torres-Laranega that, if he signed the waiver, the FBI would release his father. Agent Medina testified that he made no promises or threats to Torres-Laranega. In contrast, Torres-Laranega testified that he believed that the agents would release his father if he signed the waiver.

Based on Torres-Laranega's version of the disputed facts, he argues that the waiver of his *Miranda* rights was coerced by the arresting and the interviewing agents. According to Torres-Laranega, the agents purposely chose to arrest his father along with him so that Torres-Laranega would have no choice but to agree to waive his rights and make a statement. Moreover, Torres-

Laranega argues, there was no reason to arrest his father, who had not been charged with a crime, other than for the purpose of coercing Torres-Laranega into waiving his rights and providing the agents with information to further their investigation. Finally, Torres-Laranega argues that the fact that he was not shown an arrest warrant or his indictment before his waived his rights demonstrates that his waiver was not knowing and voluntary.

Even assuming that Torres-Laranega's version of the facts is accurate, the Court is not persuaded that the waiver of his *Miranda* rights was not knowing and voluntary. Torres-Laranega's testimony establishes that he knew what it meant to waive his rights and that he made a conscious choice to do so. The fact that he made that choice in order to facilitate his father's release does not suggest that the choice was unintelligently or involuntarily made. To the contrary, Torres-Laranega's own testimony demonstrates that he intelligently and voluntarily decided that it was more important to have his father released than to remain silent.

Moreover, the fact that Torres-Laranega's decision was motivated by his belief that the FBI would release his father if he waived his rights and made a statement does not rise to the level of government coercion. In *United States v. Glover*, 104 F.3d 1570 (10th Cir. 1997), the defendant had testified at the suppression hearing that she made a conscious decision to cooperate with law enforcement because she wanted to help her co-defendant and be allowed to see him. The Tenth Circuit held that "[t]hese types of personal psychological pressures do not amount to official coercion rendering a confession involuntary." *Id.* at 1580.

Finally, the fact that Agent Medina may not have advised Torres-Laranega of the charges against him before he read him his *Miranda* rights is not determinative of whether his waiver was knowing, intelligent and voluntary. Rather, the Court must examine all of the factors, most of which

are undisputed here, including Torres-Laranega's age, intelligence and education, the details of the interrogation and the fact that Torres-Laranega made an express written waiver of his rights. Taking into consideration all of these factors, the Court finds that the totality of the circumstances demonstrates that Torres-Laranega's waiver was voluntary, knowing and intelligent.

## CONCLUSION

The Court finds that Torres-Laranega's waiver of his *Miranda* rights was knowing, voluntary and intelligent. For this reason, his statement was not obtained in violation of either his Sixth Amendment rights or his Fifth Amendment rights. Accordingly, there is no basis to suppress his statement.

**IT IS THEREFORE ORDERED** that Defendant Jorge Torres-Laranega's Motion to Suppress Statements and Evidence **[Doc. No. 304]** is hereby **DENIED**.

Dated this 22nd day of November, 2004.

_____
MARTHA VÁZQUEZ
CHIEF UNITED STATES DISTRICT JUDGE

Attorneys for Plaintiff:
Ken Gonzales
John G. Crews, III

Attorney for Defendant Jose Francisco Diaz
Anthony White
Attorney for Defendant Gabriel Fernandez
Douglas Couleur
Attorney for Defendant Edgar Lopez-Hernandez
Joe M. Romero
Attorney for Defendant Jessica Mendoza
Howard Anderson
Attorney for Defendant Jorge Torres-Laranega
Marcia Milner

<u>Attorney for Martin Mendivil</u>
Ken Del Valle