## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                    No.  CR-03-2112 MV

JORGE TORRES-LARANEGA, et al.,

        Defendants.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Jessica Mendoza's Motion to Suppress All Evidence Derived From the Wiretap of Telephone Number (505) 640-3405, Filed Under Cause No. 03-MC-18, and the Wiretap of Telephone Number (505) 635-5463, Filed Under Cause No. 03-MC-5804 ("Motion to Suppress") **[Doc. No. 292]**, filed September 13, 2001, Notice of Joinder by Defendant Jorge Torres-Laranega Joining Co-Defendant Jessica Mendoza's Motion to Suppress **[Doc. No. 324]**, filed October 6, 2004 and Defendant Jose Francisco Diaz's Notice of Joinder **[Doc. No. 323]**, filed October 5, 2004. The Court, having considered the motions, briefs, relevant law and being otherwise fully informed, finds that the Motion to Suppress is not well taken and will be **DENIED**.

### BACKGROUND

On July 23, 2003, United States District Judge Conway approved an affidavit and application for the interception of telephone communications in 03-MC-18, for telephone number (505) 640-3405, ESN 61434B82 ("Target Telephone 1") and entered an order authorizing interception for a period of 30 days.  Although the named subscriber on the phone was "Jose Sanchez," the FBI gave the phone to Jorge Torres-Laranega and Jessica Mendoza for their use.  The order resulted in the

interception of numerous telephone conversations until August 7, 2003, when Target Telephone 1 was seized as part of a seizure of 1,400 pounds of marijuana at 405 Cinecue Way, El Paso, Texas.

On August 28, 2003, United States District Judge Brack approved an affidavit and application for the interception of telephone communications in 03-MC-580, for telephone number (505) 635-5463, ESN 06912435520 ("Target Telephone 2") and entered an order authorizing interception for a period of 30 days. Although the named subscriber on the phone was "Joe Sanchez," again, the FBI delivered the phone to Torres-Laranega and Mendoza for their use. The order authorizing the interception of telephone calls resulted in the interception of numerous telephone conversations.

On September 13, 2004, Defendant Jessica Mendoza filed the instant motion to suppress all evidence seized pursuant to the wiretaps of Target Telephone 1 and Target Telephone 2. The government filed a response in opposition on September 22, 2004. The Court held a hearing on October 6, 2004. At the conclusion of the hearing, the Court took the Motion to Suppress under advisement.

## DISCUSSION

Defendant argues that the affidavits in support of the applications for the wiretaps were insufficient to meet 18 U.S.C. §2518(1)(c), which requires the government to show the necessity of the wiretaps sought. According to Defendant, the affidavits demonstrate that the government had more than enough information to proceed with the criminal prosecution of the named co-defendants on the drug charges and that the wiretap was unlikely to produce any information regarding an assault/abduction that the government suspected was to take place. Thus, Defendant argues, the government really had no need for the wiretaps but simply sought the interceptions to cap an otherwise productive investigation. As set forth herein, the Court does not agree.

## I.     "Necessity" Requirement under 18 U.S.C. §2518(1)(c)

"Electronic eavesdropping by law enforcement officials is governed by the federal wiretap statute, title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended." *United States v. Castillo-Garcia*, 117 F.3d 1179, 1184 (10th Cir.) (citation omitted)*, cert. denied sub nom.*, *Amendariz-Amaya v. United States*, 522 U.S. 962 (1997).   Title III contains a "necessity" requirement which must be satisfied before a wiretap order lawfully may be issued.  The purpose of the necessity requirement "is to ensure that the relatively intrusive device of wiretapping 'is not resorted to in situations where traditional investigative techniques would suffice to expose the crime.'" *United States v. Edwards*, 69 F.3d 419, 429 (10th Cir. 1995) (citation omitted), *cert. denied sub nom.*, *Chaplin v. United States*, 517 U.S. 1243 (1996).  This necessity requirement is set forth at 18 U.S.C. §2518(1)(c), which provides:

> Each application for an order authorizing or approving the interception of a wire, oral, or electronic communication . . . shall include . . . a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous.

In addition, the judge issuing the wiretap order must be convinced, *inter alia*, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. §2518(3)(c).

If these statutory requirements are not met, the warrant should not issue.  "A successful challenge to the necessity of a wiretap results in the suppression of evidence seized pursuant to that wiretap." *United States v. Ramirez-Encarnacion*, 291 F.3d 1219, 1222 (10th Cir. 2002).  "[A] wiretap authorization order is presumed proper, and a defendant carries the burden of overcoming this presumption." *Castillo-Garcia*, 117 F.3d at 1186.

The Tenth Circuit has set forth in detail what the government must include in an application for a wiretap order to meet the necessity requirement:

> To obtain an electronic surveillance order, the government must explain fully in its application what investigative techniques have been tried against the target of the wiretap. If any of the four categories of normal investigative techniques referred to in the legislative history of Title III have not been tried, the government must explain with particularity why each of such untried techniques would be either unsuccessful or too dangerous. Those investigative procedures are: (1) standard visual and aural surveillance; (2) questioning and interrogation of witnesses or participants (including the use of grand juries and the grant of immunity if necessary); (3) use of search warrants; and (4) infiltration of conspiratorial groups by undercover agents or informants. In addition, if other normal investigative techniques such as pen registers or trap and trace devices have not been tried, a similar explanation must be offered as to why they also would be unsuccessful or too dangerous.

*Id.* at 1187. Moreover, the Tenth Circuit has made clear that "generalities, or statements in the conclusory language of the statute, are insufficient to support a wiretap application. The statements must be factual in nature and they must specifically relate to the individuals targeted by the wiretap." *Id.* at 1188. The government, however, is not required to "exhaust or explain its failure to exhaust every *conceivable* investigative procedure before resorting to wiretapping." *Id.* (emphasis in original). Rather, the government must "prove exhaustion – either by attempt or explanation of why the method would not work – of all 'reasonable' investigatory methods." *Id.*

## II.     The Applications for a Wiretap in the Instant Case

### A.     Wiretap for Target Telephone 1

The affidavit in support of the application for the wiretap of Target Telephone 1, attached to the government's response as Exhibit 1a, addresses each category of alternative investigative techniques and sets forth why these techniques were used or were not used because the government believed they would be unsuccessful or too dangerous. Defendant argues that these allegations are

insufficient. First, she argues that the affidavit fails to include the necessary statement that "efforts to utilize normal investigative procedures have failed, reasonably appear to be unlikely to succeed if tried or are too dangerous." In addition, she argues that the language in the affidavit is boilerplate with very little meaningful discussion on the inadequacy of the normal investigative techniques. Defendant argues that since the affidavit did not permit the authorizing judge to assess the success of the investigation, he could not properly determine the necessity of the wire interception.

In contrast, the government argues that the allegations in the affidavit are sufficient. According to the government, the affidavit clearly describes all of the normal investigatory techniques that were considered, used or attempted but were not sufficient to develop a prosecutable case as to each of the suspect's involvement in a conspiracy in drug activities. The government concludes that Defendant has failed to rebut the presumption that the application and its supporting affidavit are proper.

Based on a review of the allegations set forth in the affidavit, the Court agrees with the government. The test for whether a wiretap should issue is not, as Defendant argues, whether the government already has a wealth of evidence or whether the government has probable cause to make arrests. Rather, the Court must examine the objectives of the investigation and then determine whether the wiretap is necessary to further those objectives. As set forth herein, the Court finds that the government adequately justified the necessity of the wiretap to further the objectives of its investigation.

1.      **Physical Surveillance**

The affidavit states that physical surveillance contributed to two seizures of marijuana in May, 2003 in Las Cruces and in July, 2003 in Chicago.  The affidavit further states that, during the Chicago operation, it was observed that the drug trafficking organization used the counter-surveillance technique of employing a chase vehicle.  Moreover, the affidavit states, comments by members of the organization to the Confidential Source ("CS") indicate that they are surveillance conscious.  In addition, the affidavit states, surveillance cannot provide insight as to the nature of the meetings in which subjects might be observed participating.  Furthermore, the affidavit notes, law enforcement officers engaged in surveillance must devote a significant amount of time and energy to avoid detection.

The affidavit thus explains that, while surveillance was successful in that it resulted in two seizures of marijuana, it was not successful in identifying all of the participants, the source of the drug supply, from where the drugs were coming and where the drugs ultimately were going.  Similarly, the affidavit explains that surveillance would not be helpful in identifying other participants or their involvement in the conspiracy.  In addition, the affidavit sufficiently describes this organization's use of counter-surveillance.  Accordingly, the affidavit explains how surveillance was tried and how, while it was successful to a certain extent, it could not provide the government agents with the information they ultimately sought.

2.      **Use of Confidential Sources**

The affidavit states that the CS has identified subjects, vehicles and stash houses and has reported on some of the tentative plans of Torres-Laranega and the organization.  The CS also alerted the FBI to the possibility of an abduction/assault and has provided the names of the intended victims.

The affidavit states, however, that it would be uncharacteristic for the CS to ask additional questions to gain more information about the abduction/assault and would place the CS in danger of injury/death. Due to the limited role of the CS in the organization, the affidavit continues, the CS cannot identify all of the co-conspirators or the extent of the conspiracy and is not privy to all of the drug-related telephone conversations being conducted by the organization.

The affidavit thus explains why the CS had limited usefulness. As the government noted, the CS was aware of the danger in associating with this organization and knew that probing too far into the intimate details of the organization presented very real risks. The affidavit specifically shows that the CS met with Torres-Laranega's father for the purpose of obtaining a vehicle title and she was told, "Don't get too deep into this. You'll get killed." Similarly, the affidavit shows that Torres-Laranega told the CS that if an individual provided information about him to the police, he would come after his or her kids "and will hit them where it hurts." Accordingly, further use of the CS could have compromised her safety.

Moreover, out of sixty telephone calls inventoried pursuant to a pen register and trap and trace to and from the target telephone, only nine calls were made to or from the CS. The CS had no information about the other fifty-one calls. The CS thus was privy only to a small aspect of the organization's activities. The CS was not able to provide the agents with anything beyond what she was allowed by the organization to hear and see. For instance, the CS did not know the identity of many of the individuals involved with the organization. Accordingly, the affidavit sufficiently explains how the CS was used and how, while she was helpful to a certain extent, she could not provide the government agents with all of the information they sought.

### 3.   Use of Undercover Agents

The affidavit states that an undercover agent ("UA") had recently been introduced over the telephone to Torres-Laranega as a truck driver and that Torres-Laranega expressed interest in hiring him, although it had not happened yet.  The affidavit states that the UA's role would be limited to transporting loads and thus that it would be unlikely that he would be in a position to identify all co-conspirators and the extent of the conspiracy.

The affidavit demonstrates that, although the CS introduced the UA to Torres-Laranega by telephone as a truck driver and Torres-Laranega agreed to meet and hire the UA to drive loads of marijuana, attempts to meet failed when Torres-Laranega failed to show up at the designated meeting place.  Moreover, the affidavit sufficiently makes clear that the UA's role would be limited and likely would not provide significant insight into the identity of all co-conspirators or the full scope of the conspiracy.  Thus, the affidavit sufficiently explains how efforts were made to use a UA but that this method simply was not effective.

### 4.   Interviews and Grand Jury Subpoenas

In the affidavit, Agent Viera states that, in his experience, interviews and grand jury subpoenas are usually unsuccessful.  He states that it is more likely that these subjects will invoke their Fifth Amendment rights against self-incrimination if they are approached.  Consequently, he states, the subjects would be alerted to the existence of the government's investigative efforts and might flee, obtain false identification, destroy evidence, harm cooperating witnesses or change communication facilities.

The affidavit makes clear that the technique of grand jury subpoenas was considered but ruled out for legitimate reasons, including the likelihood that the subpoena would tip off the organization

to the existence of the investigation.  Moreover, the government expected that any organization member subpoenaed likely would exercise his or her Fifth Amendment rights.  Thus, this technique properly was ruled out because the investigation would be compromised and a subpoena likely would not aid law enforcement efforts at that early stage of the investigation.  The affidavit sufficiently demonstrates that the government did a balancing test of the costs and benefits of this technique and, as a result of that test, properly determined that the costs would have outweighed the benefits.

**5.**        **Search Warrants and Trash Searches**

The affidavit states that investigation to date had not revealed the location of residences and businesses of numerous subjects, including Torres, Oscar (last name unknown).  Moreover, the affidavit states, there is not sufficient probable cause to obtain a search warrant for the residences or businesses of many of the subjects.  The affidavit further states that trash searches are not possible until these locations are determined.

The affidavit makes clear that these techniques were considered and ruled out because agents were not able to identify locations of residences or businesses to search, let alone develop probable cause to support a warrant.  For instance, as the government states, the CS was sent to a residence to obtain a vehicle title from Torres-Laranega's father and the residence location was ascertained. Although there was credible evidence that vehicle titles and other documents were located at this residence, the evidence alone would have been insufficient to establish a nexus between the residence and drug-related activity.  Moreover, as the government argues, the likelihood that execution of a search warrant would have tipped off members of the organization to the investigation outweighed the risk of a warrant search that would not produce significant evidence.

**6.**        **Pen Registers and Toll Records**

The affidavit states that toll records were collected but that the subscribers were not identified.  In addition, the affidavit states that, on July 21, 2003, a pen register/trap and trace was initiated on Target Telephone 1 but that telephone activity records alone do not allow the agents to gain information about the content of conversations or the identities of the persons using the telephones or involved in the calls.

The affidavit makes clear that although the pen register and trap and trace technique resulted in the collection of approximately sixty calls made to or from Target Telephone 1, the information was of only limited value.  Specifically, as the government argues, agents were able to determine that the phone was used to call or receive calls from Jessica Mendoza, the CS, George Garcia and Roberto Vasquez but were not able to determine the identity of the other callers, the content of the calls or the source of supply of drugs.  Because the agents did not know who was using the telephone at a particular time for a particular call, the effectiveness of this technique was only marginal in terms of the ultimate objective of the investigation, *i.e.*, identifying all of the participants in the conspiracy and the source of the drug supply.

### 7.    Conclusion

Based on the Court's review of the allegations set forth in the affidavit, the Court finds that the government adequately set forth that each of the above techniques was tried or, if it was not tried, that it was not tried because it would not have been effective or would have been too dangerous. While the government may have had substantial evidence before the wiretap was initiated, the government sufficiently demonstrated that the wiretap was necessary to further the ultimate goals of the investigation.  Accordingly, Defendant has failed to rebut the presumption that the wiretap application for Target Telephone 1 and its supporting affidavit are proper.

-10-

**B.    Wiretap for Target Telephone 2**

The affidavit in support of the application for the wiretap of Target Telephone 2, attached to the government's response as Exhibit 2a, addresses each category of alternative investigative techniques and sets forth why these techniques were used or were not used because the government believed they would be unsuccessful or too dangerous. *See* Affidavit of Agent Brian Nishida at pages 33-42.

Defendant argues that this second wiretap application, filed on August 28, 2003, was merely a repeat of the application filed on July 23, 2003 and in essence an extension of that application. According to Defendant, the new application was necessitated when Target Telephone 1 became inoperative and the FBI wanted to continue the interception of telephone calls past the 30 days allowed in the first Court Order.  Defendant argues that although the government presented its request for a second wiretap as a new and separate request, it was no more than a request for a 30 day continuation of the first wiretap.  Accordingly, Defendant argues, the affidavit in support of the wiretap should have said that it was really an extension and explained why such an extension was necessary.  Defendant recognizes that the affidavit in support of the second wiretap application, sworn to by Agent Nishida, contains additional information.  Defendant argues, however, that this information was obtained as a result of the first wiretap and that the government at that point had even more information than it did when it requested the first wiretap (implying that there was so much information, the second wiretap was not necessary).

The Court disagrees.  The second wiretap application, the supporting affidavit and the Order authorizing the wiretap are for a piece of telephone hardware and a telephone number distinct and different from the telephone hardware and telephone number involved in the first wiretap.  Moreover,

-11-

the affidavit in support of the second wiretap application clearly describes all of the normal investigatory techniques that were considered, used or attempted but were not sufficient to develop a prosecutable case as to each of the suspect's involvement in a conspiracy in drug activities. Accordingly, the affidavit provided sufficient information for the authorizing judge to assess the objectives of the investigation and determine whether the wiretap was necessary to further those objectives.

Moreover, while the government may have had substantial evidence before the second wiretap was initiated, this is not the relevant inquiry. Rather, the issue is whether the government sufficiently demonstrated that the second wiretap was necessary to further the ultimate goals of the investigation. The Court finds that the government met this burden. Accordingly, Defendant has failed to rebut the presumption that the wiretap application for Target Telephone 2 and its supporting affidavit are proper.

**III.    Information Missing from Wiretap Applications**

Defendant quotes from Agent Viera's affidavit that he has not "set forth each and every fact known to him regarding the investigation." Defendant notes that Agent Nishida's affidavit contains similar language. Based on this language, Defendant argues that Agent Viera and Agent Nishida deliberately excluded other information subjectively determined by them to be unnecessary. Moreover, Defendant argues that there is no way for her to know the extent of this undisclosed information or whether the inclusion of that information in the affidavit would demonstrate the complete lack of need for either the first or the second wiretap.

The entire quote from Agent Viera's affidavit is as follows:

**PROBABLE CAUSE**

-12-

25.     Because this affidavit is being submitted for the limited purpose of securing authorization for the interception of the wire communications to the TARGET TELEPHONE, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts I believe are essential to establish the necessary foundation for an order authorizing the interception of wire communications of the TARGET TELEPHONE.

*See* Affidavit of Agent Viera at 7.

The similar language in Agent Nishida's affidavit is as follows:

### PROBABLE CAUSE

20.     Because this Affidavit is being submitted for the limited purpose of securing authorization for the interception of wire communications, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts I believe are needed to establish the necessary foundation for an order authorizing the initial interception of wire communications to and from **TARGET TELEPHONE -2.**

*See* Affidavit of Agent Nishida at 10.

The Court finds that the agents' affirmations are for full and complete disclosure to the Court on the scope of the investigation and the breadth of evidence presented for the warrant for telephone interceptions.  The Court further finds that the agents' affirmations are appropriately made to establish the probable cause for the warrant.  Both affidavits contain ample evidence essential to allow the Court to make a fully-informed, well-reasoned decision as to whether each wiretap authorization should be issued.

Moreover, the Court agrees with the government that any purported material omissions or misstatements fail to rise to the level of intentional or reckless dishonesty on the part of either Agent Viera or Agent Nishida.  *See United States v. Leon*, 468 U.S. 897 (1984) (creating "good faith" exception to exclusionary rule).  In *Leon*, the Supreme Court "modified the Fourth Amendment exclusionary rule by holding that evidence seized pursuant to a search warrant later found to be

-13-

invalid need not be suppressed if the executing officers acted in objectively reasonable, good-faith reliance on the warrant." *United States v. Rowland*, 145 F.3d 1194, 1206 (10th Cir. 1998). The Supreme Court set forth four situations in which the good-faith exception to the exclusionary rule does not apply because "an officer would not have reasonable grounds for believing a warrant was properly issued." *United States v. Danhauer*, 229 F.3d 1002, 1007 (10th Cir. 2000). The four situations are as follows:

> First, evidence should be suppressed if the issuing magistrate was misled by an affidavit containing false information or information that the affiant would have known was false if not for his "reckless disregard of the truth." Second, the exception does not apply when the "issuing magistrate wholly abandon[s her] judicial role." Third, the good-faith exception does not apply when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Fourth, the exception does not apply when a warrant is so facially deficient that the executing officer could not reasonable believe it was valid.

*Id.* (citing *Leon*, 468 U.S. at 922-23).

In the instant case, Defendant does not argue that any of these situations is present. Indeed, the Court has heard no evidence to suggest that any of these situations is present. Accordingly, the *Leon* good faith exception is applicable.

## CONCLUSION

Based on a review of the allegations set forth in the affidavits in support of the wiretaps of Target Telephone 1 and Target Telephone 2, the Court finds that the affidavits establish that the wiretaps were necessary to further the objectives of the government's investigation. Accordingly, Defendant has failed to rebut the presumption that the wiretap applications for Target Telephone 1 and Target Telephone 2 are proper.

**IT IS THEREFORE ORDERED** that Defendant Mendoza's Motion to Suppress **[Doc. No. 292]** is hereby **DENIED**.

Dated this 22nd day of November, 2004.

_____
MARTHA VÁZQUEZ
CHIEF UNITED STATES DISTRICT JUDGE

Attorneys for Plaintiff:
Ken Gonzales
John G. Crews, III

Attorney for Defendant Jose Francisco Diaz
Anthony White
Attorney for Defendant Gabriel Fernandez
Douglas Couleur
Attorney for Defendant Edgar Lopez-Hernandez
Joe M. Romero
Attorney for Defendant Jessica Mendoza
Howard Anderson
Attorney for Defendant Jorge Torres-Laranega
Marcia Milner
Attorney for Martin Mendivil
Ken Del Valle