**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

    Plaintiff,

vs.                                                                       No.  CR-03-2112 MV

JORGE TORRES-LARANEGA, et al.,

    Defendants.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Martin Mendivil's Motion to Suppress **[Doc. No. 293]**, filed September 14, 2004, and Defendant Jose Francisco Diaz's Notice of Joinder **[Doc. No. 323]**, filed October 5, 2004. The Court, having considered the motions, briefs, relevant law and being otherwise fully informed, finds that Mendivil's Motion to Suppress is not well taken and will be **DENIED**.

## BACKGROUND

Agent Andrew Armijo testified that, on May 18, 2003, the confidential informant ("CI") in this case informed him that she had been instructed to move a semi tractor-trailer from the Pilot truck stop in Las Cruces to the Picacho Radiator Shop in Las Cruces where it would be loaded with marijuana. Based on this information, Agent Armijo set up surveillance. Agent Armijo testified that he saw the tractor-trailer being loaded with a forklift and received telephone calls from the CI that cardboard boxes were being placed in the tractor-trailer. Agent Armijo testified that the agents then observed Mendivil drive the tractor-trailer from the truck stop north on I-25. According to Agent Armijo, Agent Rene Medina traveled to the Border Patrol checkpoint north of Las Cruces on I-25 and issued to the border patrol agent on duty a "be on the lookout," ("BOLO") for the semi tractor-

trailer being driven by Mendivil. Agent Armijo testified that the FBI agents did not want to stop the truck themselves because they did not want to compromise their investigation. Agent Armijo explained that their investigation was then at the beginning stages and that the agents had not yet identified all of the major players, their roles or their means of communication.

United States Border Patrol Agent Manuel Casarez testified that, on May 18, 2003, he received a BOLO from the FBI regarding the semi tractor-trailer being driven by Mendivil. Agent Casarez testified that Mendivil entered the primary inspection station at the Border Patrol checkpoint just as Agent Casarez was finishing a primary inspection of another tractor-trailer. According to Agent Casarez, while he was talking to the driver of the other tractor-trailer, he noticed that Mendivl was moving paperwork around on the front of his dashboard and that Mendivil lit a cigarette and smoked consistently until he encountered Agent Casarez, finishing an entire cigarette in the space of approximately one minute. Agent Casarez testified that he found this behavior suspicious and that Mendivil appeared nervous.

Agent Casarez testified that, when Mendivil drove up to the primary inspection area, Agent Casarez asked Mendivil if he was a United States citizen and that Mendivil replied that he was. Agent Casarez further testified that he asked Mendivil if there was anyone else in the bunk area of the truck and that Mendivil said that there was not. Agent Casarez testified that he then asked Mendivil where he was coming from and where he was going to and that Mendivil replied that he was coming from Las Cruces and going to Albuquerque. Next, Agent Casarez, testified, he asked Mendivil what he was carrying and Mendivil stated that he was carrying "lavadoras", which is Spanish for washing machines.

Agent Casarez testified that he then asked Mendivil for his bill of lading to verify that he was carrying washing machines. According to Agent Casarez, Mendivil gave him the bill of lading which stated that he was carrying fifteen pallets of chile. Agent Casarez testified that he then asked Mendivil again what he was carrying and that Mendivil again replied, "washing machines." According to Agent Casarez, he told Mendivil that the bill of lading indicated that he was carrying chile and Mendivil said that this was "weird," as his last loads were washing machines. Agent Casarez testified that he found it odd that the bill of lading did not list the shipper's name or address. Agent Casarez testified that he again asked Mendivil if he was sure that he had the right load and then asked Mendivil for his consent to search the load in order to make sure that he was carrying what he was supposed to be carrying. According to Agent Casarez, Mendivil said that it was all right for him to search the vehicle. Agent Casarez testified that he asked Mendivil if the trailer was sealed and whether he had sealed it himself and that Mendivil responded that the shipper had sealed it. Agent Casarez testified that he asked Mendivil if there was a lock on the trailer and Mendivil replied that there was not.

At that point, Agent Casarez testified, he referred Mendivil to the secondary inspection area. According to Agent Casarez, approximately three minutes had passed since Mendivil entered the primary inspection area. Agent Casarez testified that, once at the secondary inspection area, he noticed that there was a lock on the back of the trailer and asked Mendivil why he had told him that there was no lock. According to Agent Casarez, Mendivil stated that he did not know, that it was not his lock but rather was the shipper's lock and that he did not have a key for it. Agent Casarez testified that he asked Mendivil how he was planning to open the truck to deliver the goods without a key and that Mendivil replied that he did not know. Agent Casarez testified that he asked Mendivil

if he could cut the lock to which Mendivil replied, "Do what you have to do." Agent Casarez further testified that he asked Mendivil if he would consent to a canine search of the vehicle and that Mendivil asked how long it would take. Agent Casarez testified that he told him that the canine unit was already on its way and would be there in five to ten minutes. According to Agent Casarez, Mendivil said, "That's fine." Agent Casarez testified that approximately five minutes passed between Mendivil's entry into the secondary inspection area and his consent to the dog search.

Agent Casarez testified that United States Border Patrol Agent Pedro Reyes and his dog Gino arrived approximately five minutes later. Agent Reyes testified that he put Gino on his leash and started walking with him toward Mendivil's truck. According to Agent Reyes, after a few steps, Gino stuck his nose up in the air and pulled him to the back of the truck. Agent Reyes testified that Gino then pulled him in front of the tire, put his nose to the bottom of the truck, came back around the other side, came between the tire and the bumper, put his nose to the door and started barking. According to Agent Reyes, this meant that Gino was alerting him to the presence of something in the truck. Agent Reyes testified that, as a result of Gino's alert, the agents searched the trailer and found three pallets containing boxes with plastic wrap within which were bundles of marijuana. Agent Reyes testified that they also found dried chile in the trailer.

According to Mendivil, when he first arrived at the primary inspection area, Agent Casarez asked him his nationality, where he was going and about the load in his truck. Mendivil testified that he told Agent Casarez that he was an American citizen and that he was going to Albuquerque. Mendivil offered inconsistent testimony with regard to what he told Agent Casarez about his load. First, Mendivil testified that he stated that he had not seen the log or his bill of ladings. Later, Mendivil testified that he told Agent Casarez, "I don't know what I have right now. I hadn't noticed.

-4-

I was just going on a short trip." When asked on cross-examination whether he remembered telling Agent Casarez that he was carrying "lavadoras", Mendivil replied, "I said it might be washers, it might be chile." Then, when asked on cross-examination whether he really said anything about chile, Mendivil testified, "I just -- I hadn't noticed the truck. I said I carry all kinds of load. . . . I said I might be carrying [lavadoras], yes, sir. I told him I did not know, because I had not checked out the bill of lading."

Mendivil testified that Agent Casarez asked for the bill of lading, which Mendivil showed him. Mendivil testified that Agent Casarez asked him to move to the secondary inspection area and, once there, to exit his vehicle. According to Mendivil, the agents held him at the back of his trailer and brought a canine unit which circled the truck. Mendivil testified that he did not give his consent to a search of his vehicle and that the agents never asked him whether they could search but rather just said that they were going to do it. Mendivil testified that he could see the dog being taken around his truck and that the dog was just hopping around all of the time.

At that point, Mendivil testified, the agents told him to open the trailer and he replied that he was not authorized to do so. According to Mendivil, the agents told him that they were going to open the trailer and he replied, "That's up to you. I don't have the authority." Also according to Mendivil, the agents told him to remove the lock on the trailer and he replied that he did not have a key to the lock. Mendivil testified that, although he actually did have the key, at the time, he had no recognition of a key. Mendivil testified that the agents told him that they were going to break the lock, which they did, and that the agents then put the dog inside the truck. After that, Mendivil testified, the agents put him inside the checkpoint cell.

On September 14, 2004, Mendivil filed the instant motion to suppress. The government's reply followed on September 22, 2004. The Court held an evidentiary hearing on October 5 and October 6, 2004. At the conclusion of the hearing, the Court took the motion under advisement.

## DISCUSSION

Mendivil seeks to suppress any evidence discovered and seized pursuant to his detention at the checkpoint on the following bases: (1) the Las Cruces checkpoint is a narcotics checkpoint rather than a border checkpoint, and thus is unlawful under *City of Indianapolis v. Edmond*, 121 S. Ct. 447 (2000); (2) after Agent Casarez finished questioning Mendivil about his citizenship, Agent Casarez needed probable cause to ask any additional questions; because no such probable cause existed, all further questioning constituted an unlawful detention that exceeded the permissible scope of a vehicle stop at a permanent border checkpoint; and (3) the dog alert, if any, to Mendivil's trailer did not constitute probable cause to search.

**I.     The *Edmond* Decision**

In *Edmond*, the Supreme Court held that a checkpoint program with the primary purpose of interdicting illegal narcotics violated the Fourth Amendment. In explaining this holding, the Supreme Court stated:

> We have never approved a checkpoint program whose primary purpose was to detect evidence of ordinary criminal wrongdoing. . . . [E]ach of the checkpoint programs that we have approved was designed primarily to serve purposes closely related to the problems of policing the border or the necessity of ensuring roadway safety. Because the primary purpose of the Indianapolis narcotics checkpoint program is to uncover evidence of ordinary criminal wrongdoing, the program contravenes the Fourth Amendment.

531 U.S. at 41-42 (citations omitted).

In *Edmond,* the Supreme Court reiterated its prior decision in *United States v. Martinez-Fuerte*, 428 U.S. 543 (1976), upholding "brief, suspicionless seizures of motorists at a fixed Border Patrol checkpoint designed to intercept illegal aliens." *Edmond*, 531 U.S. at 37 (citations omitted). Thus, *Edmond* did not change the prior law established in *Martinez-Fuerte*, in which the Supreme Court held that "stops for brief questioning routinely conducted at permanent checkpoints are consistent with the Fourth Amendment and need not be authorized by warrant." *Martinez-Fuerte*, 428 U.S. at 566. Moreover, *Edmond* specifically provides that "the purpose inquiry in this context is to be conducted only at the programmatic level and is not an invitation to probe the minds of individual officers acting at the scene." *Edmond*, 531 U.S. at 48; *see also United States v. Moreno-Vargas*, 2002 WL 31829306 (5th Cir. Dec. 18, 2002) (*Edmond* requires no more than that the checkpoint have as its primary programmatic purpose the enforcement of immigration laws), *cert. denied*, 538 U.S. 962 (2003). Finally, while *Edmond* requires that a checkpoint program have a lawful primary purpose, this case "does not impair the ability of police officers to act appropriately upon information that they properly learn during a checkpoint stop justified by a lawful primary purpose, even where such action may result in the arrest of a motorist for an offense unrelated to that purpose." *Id.*

Mendivil claims that the Las Cruces checkpoint is being conducted as an illegal drug checkpoint, if not at all times, at the time of his arrest. Mendivil finds support for his position in the presence of a canine, cameras and large signs advertising the amount and type of drugs seized at the checkpoint. Mendivil also notes that the checkpoint is 90 miles away from the closest international border and that drunk drivers are arrested and detained at the checkpoint.

The Government argues that the primary purpose of the Las Cruces checkpoint is the enforcement of immigration laws and control of the borders of the U.S., not drug interdiction. In support of this argument, the Government cites *United States v. Anderson*, 468 F.2d 1280 (10th Cir. 1972), in which the Tenth Circuit held that the Truth or Consequences checkpoint, which is 98 air miles from the border, qualifies as a valid checkpoint at which border patrol agents are authorized to stop vehicles without a warrant and search them for aliens. According to the government, the Las Cruces checkpoint is less than 60 miles from the border. The government also notes that the Las Cruces checkpoint previously has been recognized as a permanent, fixed immigration checkpoint by the Tenth Circuit. *See United States v. Martin*, 15 F.3d 943, 945 (10th Cir. 1994) (adopting district court's findings of fact including: "The United States Border patrol operates three permanent checkpoints in southern New Mexico; the I-25 checkpoint north of Las Cruces . . ."). Further, the Government argues that the presence of a canine does not convert the checkpoint into a drug interdiction checkpoint, as the canine was trained to enforce the immigration laws by detecting the presence of hidden human beings as well as contraband drugs.

Mendivil's argument that the Las Cruces checkpoint is improper under *Edmond* is not persuasive. The presence of a canine, cameras and large signs advertising the amount and type of drugs seized at the checkpoint is insufficient to establish that the primary, programmatic purpose of the checkpoint is drug interdiction rather than immigration control. Accordingly, *Edmond* does not provide a basis for suppressing the evidence seized.

## II. The Permissible Scope of a Stop at a Fixed Border Checkpoint

Under *Martinez-Fuerte*, at a fixed checkpoint, border patrol agents may stop, briefly detain, and question individuals without any individualized suspicion that the individuals are engaged in

criminal activity. *See* 428 U.S. at 562. Moreover, "[b]order patrol agents have 'virtually unlimited discretion to refer cars to the secondary inspection area.'" *United States v. Sanders*, 937 F.2d 1495, 1499 (10th Cir. 1991), *cert. denied*, 502 U.S. 1110 (1992). "[A] routine checkpoint inquiry may properly take place at a primary inspection area, a secondary inspection area, or both as long as the scope of the inquiry is appropriate." *United States v. Ludlow*, 992 F.2d 260, 263-64 (10th Cir. 1993).

"The principle protection of Fourth Amendment rights at checkpoints lies in appropriate limitations on the scope of the stop." *Martinez-Fuerte*, 428 U.S. at 566-67. Accordingly, "[a] routine checkpoint stop must be brief and unintrusive." *United States v. Rascon-Ortiz*, 994 F.2d 749, 752 (10th Cir. 1993). A routine checkpoint stop involves:

> questions concerning the motorist's citizenship or immigration status, and a request for documentation. A cursory visual inspection of the vehicle is also routine, and a few brief questions concerning such things as vehicle ownership, cargo, destination, and travel plans may be appropriate if reasonably related to the agent's duty to prevent the unauthorized entry of individuals into this country and to prevent the smuggling of contraband.

*Id.* at 752 (internal citations omitted).

If, during this initial, routine questioning an agent observes "suspicious circumstances," the agent also may "briefly question the motorist concerning those suspicions and ask the motorist to explain." *United States v. Massie*, 65 F.3d 843, 848 (10th Cir. 1995) (citation omitted). A suspicious circumstance is not equivalent to the reasonable suspicion standard. *Id.* Moreover, there is no single or narrow definition of a suspicious circumstance. *Id.* In construing what "suspicious circumstances" means:

> some deference is properly given to border patrol agents who, as law enforcement officers, are specifically trained to look for indicia of crime, with an emphasis on immigration and customs laws. So long as their interrogation bears a reasonable relationship to their unique duties, the judiciary is properly reluctant to interfere, and

>  a reviewing court should only determine whether the suspicious circumstances as perceived by the border patrol agent are supported by the facts.

*Id.* (citation omitted). The court applies a "common sense view of the totality of the circumstances" to determine whether suspicious circumstances exist. *Id.* (citation omitted).

In summary, "during a routine fixed-checkpoint stop a border patrol agent may ask questions reasonably related to his duties and explore suspicious circumstances, but must be brief and unintrusive." *Id.* A stop within these parameters "is not custodial and *Miranda* warnings are not necessary." *United States v. Hudson*, 210 F.3d 1184, 1191 (10th Cir. 2000). The law is clear that any continued "detention of an individual beyond the scope of a routine checkpoint stop must be based upon reasonable suspicion, consent, or probable cause." *Massie*, 65 F.3d at 848.

For example, in *Massie*, the Tenth Circuit found the following evidence sufficient to support the agents' determination that suspicious circumstances existed: the defendant and his co-defendant gave conflicting answers as to where they had come from; the defendant appeared nervous because he would not make eye contact with the agent and was speaking in a loud voice; the defendant and his co-defendant could not agree on whom they had been visiting; the co-defendant produced identification that the agent found suspect; and the defendant and his co-defendant gave conflicting answers when asked what was in the trunk of the car. *See Id.* at 849. In addition, the Tenth Circuit concluded that the agents' continued detention and questioning of the defendant did not exceed the confines of a routine checkpoint stop, because the questioning lasted only eight to eleven minutes from the time the defendants were stopped at primary to the moment the dog alerted on the trunk; the agents' questions were not overly intrusive; and the agents' questions about citizenship, vehicle

ownership, vehicle contents, destination and travel plans all bore a reasonable relationship to the agents' duties. *See Id.*

This standard applies regardless of the BOLO that Agent Medina issued to Agent Casarez. In *Hudson*, the defendants argued that the facts of the case took it outside of the *Massie* heartland and into the area of *Miranda* custody. In that case, the border patrol agent recognized that the license plate of the truck the defendants were driving was the subject of a BOLO concerning the possible transportation of narcotics. The defendants argued that the border patrol agent asked questions in an attempt to substantiate the BOLO rather than in an effort to dissipate any suspicions arising purely out of the interactions at the checkpoint. The Tenth Circuit held that this argument "is directly contrary to the Supreme Court's holding in *Berkemer* [ *v. McCarty*, 468 U.S. 420 (1984)], wherein the Court held that unrevealed subjective intent of law enforcement officers is irrelevant to the question of custody." *Hudson*, 210 F.3d at 1192; *see also Berkemer*, 468 U.S. at 442 ("A policeman's unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time; the only relevant inquiry is how a reasonable [person] in the suspect's position would have understood his situation."). Accordingly, this Court is prohibited from basing a custody determination on the officer's unstated ulterior motives. *See Hudson*, 210 F.3d at 1192.

During a routine fixed-checkpoint stop, consent is not required for a dog sniff. *United States v. Chavira*, 9 F.3d 888, 890 n.1 (10th Cir. 1993). Consent to search, however, is required for "continued detention beyond the lawful period" of the routine fixed-checkpoint stop. *Id.* at 890 n.1.

In the instant case, Mendivil argues that, once Agent Casarez ascertained his immigration status, his detention should have ended. In support of this argument, Mendivil asserts that there is no evidence that there were suspicious circumstances to justify his continued detention. Rather,

-11-

Mendivil contends, Agent Casarez improperly detained him based solely on the BOLO that he received from the FBI.

The Court disagrees. Applying a common sense view of the totality of the circumstances, there is ample evidence[1] to support Agent Casarez's determination that suspicious circumstances existed to justify his continued detention of Mendivil. Moreover, the evidence shows that Agent Casarez's detention and questioning of Mendivil did not exceed the confines of a routine checkpoint stop. Agent Casarez first began to develop suspicion during his inspection of another truck at the primary inspection area when he noticed that Mendivil was exhibiting nervous behavior. Specifically, Agent Casarez noticed that Mendivil was shuffling papers on the dashboard, fidgeting in his seat and puffing on a cigarette in what Agent Casarez viewed to be an unusual and nervous manner. Next, Agent Casarez found it suspicious that while Mendivil told him that he was carrying washing machines, the bill of lading that Mendivil showed him indicated that he was carrying fifteen pallets of red chile. Agent Casarez also found it suspicious that the bill of lading did not list the shipper's name or address. Agent Casarez told Mendivil what the bill of lading indicated; Mendivil could offer no explanation other than that it was "weird." It was not unreasonable for Agent Casarez to ask follow-up questions and then to refer Mendivil to the secondary inspection area in order to attempt to clarify the discrepancy between Mendivil's statements and the bill of lading. Moreover, once at the secondary inspection area, Agent Casarez developed further suspicion when he noticed that there was a lock on the back of the trailer, despite Mendivil's earlier statement that there was no lock. When he asked Mendivil why he had told him that there was no lock, Mendivil's response was, "I

---

[1] To the extent that Mendivil's testimony conflicts with Agent Casarez's testimony, the Court finds that Agent Casarez was a more credible witness.

don't know." Mendivil also said that it was not his lock and that he did not have key for it. When Agent Casarez asked him how he planned to open the trailer when he arrived at his destination and deliver his load, Mendivil again replied, "I don't know."  Based on the vague and inaccurate information that Mendivil was providing, it was not unreasonable for Agent Casarez to ask for consent to search the trailer. Accordingly, Agent Casarez's questions and actions both at the primary and the secondary inspection areas were reasonably related to his duties and were a valid exploration of the suspicious circumstances that he perceived to exist.

In addition, the duration of Mendivil's detention did not exceed the scope of a reasonable checkpoint stop. Agent Casarez referred Mendivil to the secondary inspection area three minutes after he entered the primary inspection area. Approximately five minutes after he entered the inspection area, Mendivil consented to the dog search. The dog search was conducted approximately five minutes after that. Immediately after the dog alerted to the truck, the agents searched the truck, discovered the marijuana and arrested Mendivil. Accordingly, the length of Mendivil's detention was within the reasonable time frame of a checkpoint stop.

The parties dispute whether Mendivil actually consented to the canine search of his vehicle. Regardless of whether Mendivil consented, however, the evidence establishes that the dog sniff occurred during the lawful detention period of the routine checkpoint stop. Accordingly, it is irrelevant whether Mendivil consented to the search. The canine search of the trailer was proper because it was done in the context of the routine checkpoint stop.

Finally, Agent Casarez's testimony dispelled the notion that he detained Mendivil based on the BOLO rather than on his perception of suspicious circumstances. Specifically, Agent Casarez testified that the FBI agent who issued the BOLO did not tell him to stop the truck but rather

-13-

described the truck and told him to develop his own probable cause. Agent Casarez further testified that he interpreted this to mean that he had to do his routine questioning to determine whether there was something suspicious going on. As set forth above, Agent Casarez's testimony established that he did in fact develop his own suspicion of Mendivil.

### III.     Probable Cause Based on Dog Alert

Once a dog indicates the presence of narcotics, the agent has probable cause to conduct a search. *Chavira*, 9 F.3d at 890. In *United States v. Ludwig*, 10 F.3d 1523 (10th Cir. 1994), the Tenth Circuit held that the alert of a narcotics dog to the defendant's car was sufficient to give probable cause for the agents to open and search the defendant's trunk. In reaching this holding, the Tenth Circuit rejected the defendant's argument that dog sniffs are not as reliable as courts assume, stating, "a dog alert usually is at least as reliable as many other sources of probable cause and is certainly reliable enough to create a 'fair probability' that there is contraband." *Id.* at 1527. The Tenth Circuit, however did state that "[a] dog alert might not give probable cause if the particular dog had a poor accuracy record." *Id.* at 1528. In the case before it, however, the "evidence show[ed] that the dog in this case has never falsely alerted." *Id.*

Agent Reyes testified that he has been a canine handler for eight years and that he and his dog, Gino, are certified to conduct inspections. Agent Reyes explained the certification process, which involves an initial training and annual certification tests. Agent Reyes' and Gino's last certification was in September 2004. Moreover, Agent Reyes and Gino were certified as of the date of Mendivil's stop. Agent Reyes explained that, in order to be certified, the dog must be able to alert to people, cocaine, methamphetamine, marijuana and heroin. Agent Reyes described an alert as a change in

body posture and increased respiration when the dog first encounters one of the odors that he has been trained to detect.

With regard to the dog sniff of Mendivil's truck, Agent Reyes testified that he put Gino on his leash and started walking with him toward Mendivil's truck. After a few steps, Gino stuck his nose up in the air and pulled him to the back of the truck. Gino then pulled him in front of the tire, put his nose to the bottom of the truck, came back around the other side, came between the tire and the bumper, put his nose to the door and started barking. According to Agent Reyes, this meant that Gino was alerting him to the presence of something in the truck. As a result of Gino's alert, the agents searched the trailer and found three pallets containing boxes with plastic wrap within which were bundles of marijuana.

Although acknowledging that a dog search may be evidence adequate to support a search, Mendivil challenges the reliability of the dog alert here and, consequently, challenges the probable cause to search his trailer without a warrant and without consent. Mendivil, however, provides no basis for his argument that Gino's alert was unreliable. Specifically, Mendivil has provided no evidence regarding Gino's accuracy record. Moreover, Mendivil has provided no evidence to rebut Agent Reyes' testimony regarding his and Gino's certification or to call into question Agent Reyes' ability to read Gino's behavior as an alert. In the absence of such evidence, the law is clear that, once Gino alerted to the trailer, probable cause existed for the further search of the trailer and Mendivil's arrest.

## CONCLUSION

The Court finds that the Las Cruces checkpoint is not unlawful under *Edmond*. In addition, the Court finds that Agent Casarez's continued detention of Mendivil did not constitute an unlawful

detention that exceeded the permissible scope of a vehicle stop at a permanent border checkpoint. Finally, the dog alert to Mendivil's trailer constituted probable cause for the agents' search of the trailer. Accordingly, there is no basis to suppress the evidence discovered during the search of the trailer.

**IT IS THEREFORE ORDERED** that Defendant Martin Mendivil's Motion to Suppress **[Doc. No. 293]** is hereby **DENIED**.

Dated this 2nd day of December, 2004.

_____
MARTHA VÁZQUEZ
CHIEF UNITED STATES DISTRICT JUDGE

Attorneys for Plaintiff:
Ken Gonzales
John G. Crews, III

Attorney for Defendant Jose Francisco Diaz
Anthony White
Attorney for Defendant Edgar Lopez-Hernandez
Joe M. Romero
Attorney for Defendant Jessica Mendoza
Howard Anderson
Attorney for Defendant Jorge Torres-Laranega
Marcia Milner
Attorney for Martin Mendivil
Ken Del Valle