## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                   No.  CR-03-2112 MV

JORGE TORRES-LARANEGA, et al.,

       Defendants.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Martin Mendivil's Motion to Suppress Post Arrest Statement **[Doc. No. 302]**, filed September 15, 2004, and Defendant Jose Francisco Diaz's Notice of Joinder **[Doc. No. 323]**, filed October 5, 2004. The Court, having considered the motions, briefs, relevant law and being otherwise fully informed, finds that Mendivil's Motion to Suppress Post Arrest Statement is not well taken and will be **DENIED**.

### BACKGROUND

Mendivil was arrested on May 18, 2003 at the U.S. Border Patrol checkpoint on I-25 in Dona Ana County, New Mexico.  He was found in possession of more than 1,400 pounds of marijuana. He was charged in a criminal complaint with the offense of possession with intent to distribute marijuana in violation of 21 U.S.C. §841.  Assistant Federal Public Defender Steve Sosa was appointed to represent Mendivil.  Mary Stillinger subsequently entered her retained appearance on behalf of Mendivil.

Mendivil later was indicted and charged with possession with intent to distribute marijuana. Prior to a hearing scheduled on Mendivil's motion to suppress, the government moved to dismiss the

indictment with prejudice.  The court granted the motion and dismissed the indictment against Mendivil.

On February 19, 2004, Mendivil was indicted in the instant case in the District of New Mexico under the Second Superseding Indictment which charged him with conspiracy of possession with intent to distribute marijuana in violation of 21 U.S.C. §846.  An arrest warrant was issued that same day.  On Friday, February 20, 2004, FBI agents arrested Mendivil in El Paso, Texas in the Western District of Texas, which is adjacent to the District of New Mexico.

Mendivil testified that he was arrested at 11:00 a.m.  According to Mendivil, the arresting agents first took him to the FBI office in El Paso so that he could use the restroom.  Thereafter, Mendivil testified, the agents transported him to the FBI office in Las Cruces, New Mexico.  Mendivil testified that they arrived at the Las Cruces FBI office at noon.  According to Mendivil, he was held at the FBI office and continuously questioned by three agents for seven hours before he signed a waiver of rights form at 7:00 p.m.  Mendivil offered conflicting testimony regarding what he told arresting agents about having a lawyer.  Initially, Mendivil testified that he thinks he asked for an attorney but then testified that he does not remember as it was six months ago.  Next, Mendivil testified that, when he was arrested, he was asked if he wanted to speak to his attorney and he responded that he did not.  Mendivil further testified that the arresting agents knew that he had an attorney but that they did not know the name of his attorney.  Later, Mendivil testified that he believes that he told the agents that he was not represented by a lawyer.  Finally, Mendivil testified that the agents asked him if he had a lawyer and he said no.

Mendivil testified that he did not feel well that day because of his diabetes.  Specifically, Mendivil testified that he needed to urinate often and had a stomachache.  Mendivil, however, also

-2-

testified that the agents allowed him to use the restroom as needed and gave him something to eat and drink.  Mendivil testified that he signed a waiver of his *Miranda* rights and, thereafter, made a statement.

Mendivil testified that he appeared before a Magistrate Judge the following Monday.  During his appearance, Mendivil testified, he asked for an attorney to be appointed to him.  Also during his appearance, Mendivil testified, he did not tell the Magistrate Judge that he was represented by an attorney.  According to Mendivil, he did not tell the Magistrate Judge that he was represented by Ms. Stillinger because he still owed her money in connection with her prior representation.

Agent Brian Nishida testified that he arrested Mendivil at approximately 4:00 p.m. on Friday, February 20, 2004.  Further, Agent Nishida testified that, in preparation for the arrest, he contacted FBI Agent Richard Taylor in El Paso and Assistant United States Attorney Ken Gonzales in Las Cruces in order to determine what time initial appearances would be held in El Paso and in Las Cruces on the following Monday.  According to Agent Nishida, he learned that if Mendivil were initialed in El Paso, it would take place on Monday at 2:00 p.m. while if he were initialed in the District of New Mexico, it would take place on Monday morning.  Agent Nishida testified that Mendivil in fact was initialed the following Monday morning in Las Cruces.

Agent Nishida testified that he and another agent took Mendivil first to the FBI office in El Paso to use the restroom and then transported him to the FBI office in Las Cruces.  Agent Nishida testified that he was unable to find the log maintained by the FBI documenting Mendivil's arrest and transport to Las Cruces.  After the hearing, however, the government submitted a copy of the page from the FBI Radio Log for February 20, 2004, which reflects that Agent Nishida called in at 5:37 p.m. and reported: "will be transporting prisoner from El Paso to L.C. [Las Cruces]."  The log also

reflects that, at 7:44 p.m., Agent Nishida reported: "arrived at RA [Las Cruces FBI office] about 45 minutes prior to calling AQ office."

Agent Nishida testified that he read Mendivil his *Miranda* rights when he arrested him. According to Agent Nishida, he did not question him at all about the case while he was transporting him to Las Cruces.

Agent Rene Medina testified that Mendivil was arrested at approximately 5:00 p.m., that he was taken to the Las Cruces FBI office and that he arrived at the Las Cruces FBI office at approximately 6:30 p.m. Agent Medina testified that he conducted an interview of Mendivil in English and Spanish. According to Agent Medina, when Mendivil arrived, he explained to him why he had been arrested. Agent Medina testified that Mendivil appeared to understand what he was talking about, and asked whether the arrest was related to the seizure at the checkpoint. Agent Medina explained that his arrest was based on a conspiracy charge. Agent Medina testified that he then read Mendivil his *Miranda* rights from an advice of rights form. Thereafter, Agent Medina testified, he had Mendivil read aloud the waiver provision on the advice of rights form. Mendivil signed the waiver provision. The form indicates that Mendivil signed it at 7:04 p.m. Agent Medina testified that Mendivil verbally indicated that he understood his rights and was willing to talk to the agents and answer their questions. Agent Medina testified that, during the interview, Mendivil was handcuffed in the front, was allowed to use the restroom and was offered something to eat and drink. According to Agent Medina, the interview lasted for approximately one and one-half hours.

On September 15, 2004, Mendivil filed the instant motion. The government's reply followed on September 22, 2004. The Court held an evidentiary hearing on October 5 and October 6, 2004.

At the conclusion of the hearing, the Court took the motion under advisement.  On October 15, 2004, the government filed a motion to supplement the record.

## DISCUSSION

Mendivil claims that his post arrest statement should be suppressed on three bases:  (1)  his initial appearance failed to comport with Rule 5(c)(2) of the Federal Rules of Criminal Procedure; (2) his statement was taken in violation of 18 U.S.C. §3501 because it was made long after six hours of his arrest and the delay was not reasonable considering the time and distance required to travel to take Mendivil before a magistrate; and (3) the interviewing agents interfered with his pre-existing attorney-client relationship with Mary Stillinger who was not contacted before the questioning.

## I.    Rule 5(c)

Rule 5(c)(2) provides that, if the defendant is arrested in a district other than where the offense was allegedly committed, the initial appearance before the magistrate must be:

(A)  in the district of arrest; or
(B)  in an adjacent district if:
     (i)  the appearance can occur more promptly there; or
     (ii) the offense was allegedly committed there and the initial appearance will occur on the day of arrest.

According to Mendivil, Rule 5(c)(2)(B)(ii) is controlling here, as Mendivil was arrested in the Western District of Texas and the offense was allegedly committed in the adjacent District of New Mexico.  Because the initial appearance occurred in the District of New Mexico but did not occur on the day of the arrest, Mendivil argues that the government violated the mandate of Rule 5(c)(2)(B)(ii).

The Court finds, however, that Rule 5(c)(2)(B)(i) is controlling here.  Agent Nishida presented credible testimony that, in preparation for Mendivil's arrest, he contacted FBI Agent

Richard Taylor in El Paso and Assistant United States Attorney Ken Gonzales in Las Cruces in order to determine what time initial appearances would be held in El Paso and in Las Cruces on the following Monday.  Agent Nishida learned that, if Mendivil were initialed in El Paso, it would take place on Monday at 2:00 p.m. while if he were initialed in the District of New Mexico, it would take place on Monday morning.  Based on this information, the government decided to take Mendivil to the District of New Mexico where he would be able to receive his initial appearance in the morning rather than in the afternoon on Monday, February 23, 2004.  The government complied with Rule 5(c)(2)(B)(i), as the initial appearance occurred in the District of New Mexico, the district adjacent to the district of arrest, and the initial appearance could have occurred more promptly there.

## II.   Rule 5(a) and 18 U.S.C. §3501

Rule 5(a)(1)(A) of the Federal Rules of Criminal Procedure requires that an arresting officer making an arrest "take the defendant *without unnecessary delay* before a magistrate judge . . ." (emphasis added).  This rule "is meant to prevent unnecessary delay during which time arresting officers may seek to elicit confessions, or marshal evidence for presentation."  *Gregory v. United States*, 364 F.2d 210, 213 (10th Cir.)*, cert. denied*, 385 U.S. 962 (1996).  For purposes of Rule 5(a), a reasonable amount of time after arrest within which a defendant must be brought before a magistrate is six hours.  *See McNabb v. United States*, 318 U.S. 332 (1943); *Mallory v. United States*, 354 U.S. 449 (1957).

"The effect of failure to strictly comply with Rule 5(a) upon the admissibility of confessions is elucidated by the statutory enactment of 18 U.S.C. §3501."  *United States v. Shoemaker*, 542 F.2d 561, 563 (10th Cir.), *cert. denied*, 429 U.S. 1004 (1976).  Section 3501(c) provides that the admissibility of a confession made or given by a defendant while under arrest:

shall not be inadmissible solely because of delay in bringing such person before a magistrate judge . . . if such confession is found by the trial judge to have been made voluntarily and if the weight to be given the confession is left to the jury and if such confession was made or given by such person within six hours immediately following his arrest . . . *Provided,* That the time limitation contained in this subsection shall not apply in any case in which the delay in bringing such person before such magistrate judge . . . beyond such six-hour period is found by the trial judge to be reasonable considering the means of transportation and the distance to be traveled to the nearest available such magistrate judge . . .

In interpreting §3501(c), the Tenth Circuit has held that "non-compliance with the six hour rule does not *ipso facto* render a confession inadmissible." *Shoemaker*, 542 F.2d at 563. Instead, "[v]oluntariness is the sole test for admissibility of a confession." *Id.* Although the court must consider the amount of time that elapsed between arrest and arraignment in determining whether a confession made during that period is voluntary, "[s]uch a consideration is only a factor, and need not be conclusive." *Id.* A court must determine the reasonableness of the delay by "considering the means of transportation and the distance to be traveled to the nearest magistrate." 18 U.S.C. §3501(c). The Tenth Circuit has held that "post-confession delay is not pertinent to the determination of the voluntariness of a confession." *United States v. McCormick*, 468 F.2d 68, 74 (10th Cir. 1972), *cert. denied*, 41 U.S. 927 (1973); *see also Chapman v. United States*, 397 F.2d 24, 26 (10th Cir. 1968) ("The period of federal detention from July 20 to July 22 before presentation to a magistrate cannot be considered violative of Criminal Rule 5(a) because it occurred after the confession and so could not have produced it.").

On the other hand, "§3501(c) by negative implication appears to permit the exclusion of any confession which is made after six hours following arrest but prior to arraignment and where the delay between arrest and arraignment is unreasonable, even if the confession is voluntary." *United States v. Wilbon*, 911 F. Supp. 1420, 1423 (D.N.M. 1995). Thus, "if a court determines that the delay was

unreasonable and that the confession was made after six hours following arrest, such factors may constitute the sole basis for the exclusion of the confession." *Id.*; *see also Butterwood v. United States*, 365 F.2d 380, 384 (10th Cir. 1966) (statement or confession given after arresting officer has failed to comply with Rule 5(a) is inadmissible "without regard to the statement's voluntariness.").

In *Gregory*, the Tenth Circuit found that a delay from Friday evening to the following Monday was not "an unnecessary delay" for purposes of Rule 5(a). *See Gregory*, 364 F.2d at 213. Similarly, in *Sciberras v. United States*, 380 F.2d 732 (10th Cir. 1967), the defendant was apprehended in Evanston, Wyoming on the evening of August 24, 1966. He was transported to the jail in Green River, Wyoming for confinement. On the following day, August 25, 1966, two of the four co-defendants were interrogated by an FBI agent. On the following day, August 26, 1966, the third co-defendant and the defendant were interrogated by the same agent. The next two days, August 27 and 28, were Saturday and Sunday. No interrogations took place on those two days. On Monday morning, August 29, 1966, the defendant was arraigned. The Tenth Circuit held that Rule 5(a) was not violated. Moreover, in *Sablowski v. United States*, 403 F.2d 347 (10th Cir. 1968), the defendant was booked in the county jail at 11:20 a.m. following his arrest and appearance before a state magistrate. An FBI agent interviewed him four hours later after procuring a signed waiver of his rights. The defendant then voluntarily and freely told the agent all of the facts surrounding his theft of a car. The agent thus confirmed that the defendant had committed a federal offense and immediately went to the office of the United States Commissioner to secure a time for the appearance of the defendant before such officer. It was then 5:00 p.m. on a Saturday, the next day was Sunday, and the day after that was New Year's Day. The appearance date thus was set for Tuesday, January 2. The defendant was not questioned at any time by anyone between Saturday and Tuesday. The

-8-

Tenth Circuit found that Rule 5(a) was not violated and that the defendant's statements were admissible.

In support of his argument, Mendivil argues that his statement was taken in violation of §3501 because it was made long after six hours of his arrest and the delay was not reasonable considering the time and distance required to take him before a magistrate. The evidence presented at the hearing, however, suggests that this is not the case. While Mendivil testified that he was arrested at 11:00 a.m., was transported to the Las Cruces FBI office at noon and was continuously questioned for seven hours until he signed the waiver form at 7:04 p.m., Agent Nishida testified that he arrested Mendivil at approximately 4:00 p.m. and Agent Medina testified that Mendivil was arrested at approximately 5:00 p.m. Agent Nishida and Agent Medina presented credible testimony that Mendivil was advised of his rights twice, once when he was arrested and once at the commencement of the interview at the FBI office in Las Cruces. Agent Nishida presented credible testimony that he did not question Mendivil during the transport to Las Cruces. The documentary evidence establishes that Mendivil signed the waiver of rights provision on the advice of rights form at 7:04 p.m. All of the testimony establishes that, once Mendivil was arrested, the arresting agents took Mendivil to the FBI office in El Paso for a restroom stop and then took him to the FBI office in Las Cruces. The FBI Radio Log demonstrates that Agent Nishida began transporting Mendivil to Las Cruces at 5:37 p.m. and that Agent Nishida arrived at the Las Cruces FBI office with Mendivil at 7:00 p.m. The log thus corroborates the agents' testimony.

Accordingly, the Court finds that Mendivil was arrested between 4:00 p.m. and 5:00 p.m., that, after a brief stop at the El Paso FBI office, Mendivil was transported to the Las Cruces FBI office where he arrived at approximately 7:00 p.m., that Mendivil signed a waiver of rights form

minutes later at 7:04 p.m. and that Mendivil was not questioned before he signed the waiver of rights. There thus was no pre-confession delay, only a delay between Mendivil's statement on Friday evening and his initial appearance before the magistrate judge on Monday morning. The period of Mendivil's detention after his statement "cannot be considered violative of Criminal Rule 5(a) because it occurred after the confession and so could not have produced it." *Chapman*, 397 F.2d at 26.

Moreover, because Mendivil was arrested in the late afternoon or early evening on a Friday, there was an intervening weekend between Mendivil's arrest and initial appearance. Under Tenth Circuit case law, a delay in presentment under these circumstances does not violate Rule 5(a) or vitiate the voluntariness of the confession at issue. *See Wilbon,* 911 F. Supp. at 1422; *Gregory*, 364 F.2d at 213; *Sciberras*, 380 F.2d at 734; *Sablowski*, 403 F.3d at 350. The Court thus finds that the delay was reasonable. Accordingly, Mendivil's statement is admissible so long as it was voluntary.

The government bears the burden of establishing by a preponderance of the evidence that the defendant's confession was voluntary. *See United States v. Flores*, 313 F. Supp.2d 1188, 1200 (D. Utah 2004). A confession is involuntary if "the government's conduct causes the defendant's will to be overborne and 'his capacity for self-determination critically impaired.'" *Id.* (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 225-26 (1973)). In evaluating the voluntariness of a confession, the Court must examine the totality of the circumstances to determine whether "the government obtained the statements by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." *Erving L.*, 147 F.3d 1240,1248-49 (10th Cir. 1998). The following factors are relevant to this determination: "(1) the age, intelligence, and education of the defendant; (2) the length of the detention; (3) the length and nature of the questioning; (4) whether the defendant was

advised of her constitutional rights; and (5) whether the defendant was subjected to physical punishment." *United States v. Glover*, 104 F.3d 1570, 1579 (10th Cir. 1997).

In *Colorado v. Connelly*, 479 U.S. 157 (1986), the Supreme Court clarified this totality of the circumstances test, holding that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the Fourteenth Amendment." *Id.* at 167. The Tenth Circuit subsequently held: "it is clear after *Connelly* that a confession is only involuntary under the Fourteenth Amendment if the police use coercive activity to undermine the suspect's ability to exercise his free will." *Erving L.*, 147 F.3d at 1249. Based on *Connelly*, "the Tenth Circuit has consistently declined to find a confession involuntary, regardless of the unique physical or mental characteristics of a particular defendant, absent police conduct amounting to coercion, improper inducement or the exploitation of a known mental condition or defect." *Flores*, 313 F. Supp.2d at 1200.

Based on the credible evidence presented at trial, there is no indication that the agents used coercive activity to undermine Mendivil's ability to exercise his free will. As set forth above, Mendivil arrived at the Las Cruces FBI office at approximately 7:00 p.m. Agent Medina conducted an interview of Mendivil in English and Spanish. According to Agent Medina, he first explained to Mendivil why he had been arrested. Agent Medina testified that Mendivil appeared to understand what he was talking about, and asked whether the arrest was related to the seizure at the checkpoint. Agent Medina explained that his arrest was based on a conspiracy charge. Agent Medina testified that he then read Mendivil his *Miranda* rights from an advice of rights form. Thereafter, Agent Medina testified, he had Mendivil read aloud the waiver provision on the advice of rights form. Mendivil signed the waiver provision at 7:04 p.m. Agent Medina testified that Mendivil verbally

-11-

indicated that he understood his rights and was willing to talk to the agents and answer their questions.  Agent Medina testified that, during the interview, Mendivil was handcuffed in the front, was allowed to use the restroom and was offered something to eat and drink.  Mendivil testified that, on the day of his arrest, he did not feel well because of his diabetes, but that the agents allowed him to use the restroom as needed and offered him food and drink.  According to Agent Medina, the interview lasted for approximately one and one-half hours.  The evidence is devoid of any indication that the agents' conduct amounted to coercion, improper inducement or the exploitation of any physical or mental condition.  Based on the totality of the circumstances, the Court finds that Mendivil's statement was voluntary.

**III.**   **Interference with Attorney-Client Relationship**

Mendivil asserts that, at the time of his arrest on February 20, 2004, he was still represented by Mary Stillinger on the May 18, 2003 possession charge and that the FBI agents who questioned him knew of that representation.  According to Mendivil, there was still an attorney-client relationship between Mendivil and Ms. Stillinger when he was interrogated.  The agents did not contact Ms. Stillinger to ask her permission to question Mendivil on February 20, 2004.

Mendivil offered conflicting testimony regarding what he told arresting agents about having a lawyer.  Initially, Mendivil testified that he thinks he asked for an attorney but then testified that he does not remember as it was six months ago.  Next, Mendivil testified that, when he was arrested, he was asked if he wanted to speak to his attorney and he responded that he did not.  Mendivil further testified that the arresting agents knew that he had an attorney but that they did not know the name of his attorney.  Later, Mendivil testified that he believes that he told the agents that he was not represented by a lawyer.  Finally, Mendivil testified that the agents asked him if he had a lawyer and

-12-

he said no.  Accordingly, Mendivil twice stated that he told the agents that he did not have an attorney.

In addition, as Mendivil himself testified, during his initial appearance, he did not advise the Magistrate Judge that he was represented by Ms. Stillinger and, in fact, requested that an attorney be appointed to him.  The government advises that Mendivil executed a "Criminal Justice Act (CJA) Form 20," which demonstrated indigency and the entitlement to appointed counsel, and that the Court appointed Paul Rubino to represent Mendivil.  Several days later, the government notes, Mendivil and Mr. Rubino appeared for an arraignment on the charges contained in the Second Superseding Indictment.  At the arraignment, neither Mendivil nor Mr. Rubino advised the Court that Ms. Stillinger continued to represent Mendivil.  Given the fact that Mendivil admittedly did not mention Ms. Stillinger in any court proceedings, the Court finds Mendivil's testimony that he did not tell the agents he was represented by an attorney more credible than his testimony conflicting with that statement.

Given the totality of the evidence, the Court is persuaded that, on February 20, 2004, the arresting and interviewing agents had no reason to believe that there still existed an attorney-client relationship between Ms. Stillinger and Mendivil.  Accordingly, the agents did not interfere with Mendivil's attorney-client relationship with Ms. Stillinger by failing to contact her before the interview.

## CONCLUSION

First, Mendivil's initial appearance complied with Rule 5(c)(2)(B)(i), as it occurred in the District of New Mexico, the district adjacent to the district of arrest, and the initial appearance could occur more promptly there.  In addition, the delay between Mendivil's arrest and his initial

appearance before the Magistrate Judge did not violate Rule 5(a)(1)(A).  Finally, the arresting and

interviewing agents did not interfere with Mendivil's attorney-client relationship with Ms. Stillinger

as they had no reason to believe that this relationship was still in existence on February 20, 2004.

Accordingly, there is no basis to suppress Mendivil's statement.

**IT IS THEREFORE ORDERED** that Defendant Martin Mendivil's Motion to Suppress

Post Arrest Statement **[Doc. No. 302]** is hereby **DENIED**.

Dated this 6th day of December, 2004.

_____
MARTHA VÁZQUEZ
CHIEF UNITED STATES DISTRICT JUDGE

Attorneys for Plaintiff:
Ken Gonzales
John G. Crews, III

Attorney for Defendant Jose Francisco Diaz
Anthony White
Attorney for Defendant Edgar Lopez-Hernandez
Joe M. Romero
Attorney for Defendant Jessica Mendoza
Howard Anderson
Attorney for Defendant Jorge Torres-Laranega
Marcia Milner
Attorney for Martin Mendivil
Ken Del Valle