## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                                                 No.  CR-03-2112 MV

JORGE TORRES-LARANEGA, et al.,

       Defendants.

### MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on Defendant Martin Mendivil's Motion to Suppress Post Indictment Statement **[Doc. No. 291]**, filed September 7, 2004, and Defendant Jose Francisco Diaz's Notice of Joinder **[Doc. No. 323]**, filed October 5, 2004. The Court, having considered the motions, briefs, relevant law and being otherwise fully informed, finds that Mendivil's Motion to Suppress Post Indictment Statement is not well taken and will be **DENIED**.

### BACKGROUND

On February 19, 2004, Mendivil was indicted in the instant case under the Second Superseding Indictment which charged him with conspiracy of possession with intent to distribute marijuana in violation of 21 U.S.C. §846.  An arrest warrant was issued that same day.  On Friday, February 20, 2004, FBI agents arrested Mendivil in El Paso, Texas in the Western District of Texas, which is adjacent to the District of New Mexico.

Mendivil testified that he was arrested at 11:00 a.m.  According to Mendivil, the arresting agents first took him to the FBI office in El Paso so that he could use the restroom.  Thereafter, Mendivil testified, the agents transported him to the FBI office in Las Cruces, New Mexico.  Mendivil testified that they arrived at the Las Cruces FBI office at noon.  According to Mendivil, he was held

at the FBI office and continuously questioned by three agents for seven hours before he signed a waiver of rights form at 7:00 p.m.  Mendivil offered conflicting testimony regarding what he told arresting agents about having a lawyer.  Initially, Mendivil testified that he thinks he asked for an attorney but then testified that he does not remember as it was six months ago.  Next, Mendivil testified that, when he was arrested, he was asked if he wanted to speak to his attorney and he responded that he did not.  Mendivil further testified that the arresting agents knew that he had an attorney but that they did not know the name of his attorney.  Later, Mendivil testified that he believes that he told the agents that he was not represented by a lawyer.  Finally, Mendivil testified that the agents asked him if he had a lawyer and he said no.

Mendivil testified that he did not feel well that day because of his diabetes.  Specifically, Mendivil testified that he needed to urinate often and had a stomachache.  Mendivil, however, also testified that the agents allowed him to use the restroom as needed and gave him something to eat and drink.  Mendivil testified that he signed a waiver of his *Miranda* rights and, thereafter, made a statement.

Agent Brian Nishida testified that he arrested Mendivil at approximately 4:00 p.m. on Friday, February 20, 2004.  Agent Nishida testified that he and another agent took Mendivil first to the FBI office in El Paso to use the restroom and then transported him to the FBI office in Las Cruces.  Agent Nishida testified that he was unable to find the log maintained by the FBI documenting Mendivil's arrest and transport to Las Cruces.  After the hearing, however, the government submitted a copy of the page from the FBI Radio Log for February 20, 2004, which reflects that Agent Nishida called in at 5:37 p.m. and reported: "will be transporting prisoner from El Paso to L.C. [Las Cruces]."  The

log also reflects that, at 7:44 p.m., Agent Nishida reported: "arrived at RA [Las Cruces FBI office] about 45 minutes prior to calling AQ office."

Agent Nishida testified that he read Mendivil his *Miranda* rights when he arrested him. According to Agent Nishida, he did not question him at all about the case while he was transporting him to Las Cruces.

Agent Rene Medina testified that Mendivil was arrested at approximately 5:00 p.m., that he was taken to the Las Cruces FBI office and that he arrived at the Las Cruces FBI office at approximately 6:30 p.m. Agent Medina testified that he conducted an interview of Mendivil in English and Spanish. According to Agent Medina, when Mendivil arrived, he explained to him why he had been arrested. Agent Medina testified that Mendivil appeared to understand what he was talking about, and asked whether the arrest was related to the seizure at the checkpoint. Agent Medina explained that his arrest was based on a conspiracy charge. Agent Medina testified that he then read Mendivil his *Miranda* rights from an advice of rights form. Thereafter, Agent Medina testified, he had Mendivil read aloud the waiver provision on the advice of rights form. Mendivil signed the waiver provision on the advice of rights form. The form indicates that Mendivil signed it at 7:04 p.m. Agent Medina testified that Mendivil verbally indicated that he understood his rights and was willing to talk to the agents and answer their questions. Agent Medina testified that, during the interview, Mendivil was handcuffed in the front, was allowed to use the restroom and was offered something to eat and drink. According to Agent Medina, the interview lasted for approximately one and one-half hours.

On September 7, 2004, Mendivil filed the instant motion. The government's reply followed on September 22, 2004. The Court held an evidentiary hearing on October 5 and October 6, 2004.

At the conclusion of the hearing, the Court took the motion under advisement.  On October 15, 2004, the government filed a motion to supplement the record.

## DISCUSSION

### I.     Waiver of Sixth Amendment Right

Mendivil states that he never waived his Sixth Amendment right to counsel and thus that his post-indictment statement made outside the presence of counsel violated his Sixth Amendment rights. In support of his argument, Mendivil cites *Fellers v. United States*, 124 S. Ct. 1019 (2004).  Mendivil appears to be arguing that the Fifth Amendment analysis of whether he knowingly and voluntarily waived his *Miranda* rights is inadequate to protect his Sixth Amendment right to counsel in light of the recent Supreme Court decision in *Fellers*.

In *Fellers*, the defendant sought to suppress incriminating statements made to police at the jailhouse afer a knowing and voluntary waiver because those statements were the fruits of earlier police questioning at the defendant's home that violated the Sixth Amendment.  The Supreme Court held "that an accused is denied 'the basic protections' of the Sixth Amendment 'when there [is] used against him at his trial evidence of his own incriminating words, which federal agents . . . deliberately elicited from him after he had been indicted and in the absence of his counsel."  *Id.* at 1022 (citations omitted).  The Supreme Court found that the Eighth Circuit erred in holding that the absence of an "interrogation" foreclosed the defendant's claim that his jailhouse statements should have been suppressed as fruits of the statements taken from him at his home.  First, the Supreme Court explained:

> [T]here is no question that the officers in this case 'deliberately elicited' information from petitioner. . . . Because the ensuing discussion took place outside the presence of counsel, *and in the absence of any waiver of petitioner's Sixth Amendment Rights*,

-4-

the Court of Appeals erred in holding that the officers' actions did not violate the Sixth Amendment standards established in *Massiah* . . . and its progeny.

*Id.* at 1023 (emphasis added).  Second, the Supreme Court found that, "because of its erroneous determination that petitioner was not questioned in violation of Sixth Amendment standards, the Court of Appeals improperly conducted its 'fruits' analysis under the Fifth Amendment."  *Id.* Specifically, the Supreme Court explained that the Court of Appeals did not reach the question whether the Sixth Amendment requires suppression of the defendant's jailhouse statements on the ground that they were the fruits of previous questioning conducted in violation of the Sixth Amendment deliberate-elicitation standard.  The Supreme Court remanded to the Eighth Circuit to determine "whether the rationale of *Elstad* [that the admissibility of jailhouse statements turns solely on whether the statements were knowingly and voluntarily made] applies when a suspect makes incriminating statements after a knowing and voluntary waiver of his right to counsel notwithstanding earlier police questioning in violation of Sixth Amendment standards."  *Id.*

*Fellers* is distinguishable from the instant case.  *Fellers* involved post-indictment questioning of a defendant in the course of an arrest in violation of that defendant's Sixth Amendment rights followed later by a second series of questioning after a waiver.  In the instant case, there is not alleged to have been any pre-waiver questioning of Mendivil in violation of his Sixth Amendment rights that served as the basis for the February 20, 2004 interview.  Mendivil's Sixth Amendment right had attached prior to the February 20, 2004 interview but Mendivil appears to have waived this right.

Moreover, *Fellers* does not stand for the proposition that the Fifth Amendment analysis of whether a defendant knowingly and voluntarily waives his *Miranda* rights is inadequate to protect the Sixth Amendment right to counsel.  The controlling precedent on this issue, which was not

changed by *Fellers*, is set forth in *Patterson v. Illinois*, 487 U.S. 285 (1988).  In *Patterson*, the

Supreme Court set forth the standard for determining a valid post-indictment waiver of the Sixth

Amendment right to counsel.  First, the Supreme Court considered and rejected the argument that

the police are barred from initiating an interview with a defendant once he has been indicted and his

Sixth Amendment right to counsel attaches.  Rather, the Supreme Court held that, even post-

indictment, a defendant's right to counsel means only that if he or she wants the assistance of counsel,

the authorities' interview with him or her must stop and further questioning is forbidden unless the

defendant calls for such a meeting.  *See id.* at 291.  The Supreme Court concluded that "[if] an

accused 'knowingly and intelligently' [decides to answer questions without the aid of counsel], we

see no reason why the uncounseled statements he then makes must be excluded at his trial."  *Id.*

The Supreme Court next rejected the petitioner's argument that questioning him without

counsel present violated the Sixth Amendment because he did not validly waive his right to have

counsel present during interviews with law enforcement.  The Supreme Court stated:

> Since it is clear that after the *Miranda* warnings were given to petitioner, he not only
> voluntarily answered questions without claiming his right to silence or his right to
> have a lawyer present to advise him but also executed a written waiver of his right to
> counsel during questioning, the specific issue posed here is whether this waiver was
> a "knowing and intelligent" waiver of his Sixth Amendment right.

*Id.* at 292.  The Supreme Court answered this question in the affirmative, holding that "an accused

who is admonished with the warnings prescribed by this Court in *Miranda* has been sufficiently

apprised of the nature of his Sixth Amendment rights, and of the consequences of abandoning those

rights, so that his waiver on this basis will be considered a knowing and intelligent one."  *Id.* at 296.

Moreover, the Supreme Court held:

> Once it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law.

*Id.* at 297 (citation omitted).

Accordingly, in order to determine whether Mendivil's Sixth Amendment rights were violated, the Court must determine whether he was advised of his *Miranda* rights and whether he validly waived those rights before giving his statement to the FBI agents.

## II.     Waiver of *Miranda* Rights

*Miranda* requires that procedural safeguards be administered to a criminal suspect prior to "custodial interrogation."  *Miranda v. Arizona*, 384 U.S. 436 (1966).  A defendant's statements cannot be used against him unless the government shows that he voluntarily, knowingly and intelligently waived his *Miranda* rights.  *See Moran v. Burbine*, 475 U.S. 412, 421 (1986).  The government bears the burden of proving a valid waiver by a preponderance of the evidence.  *See Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

The Supreme Court has held that the Court's inquiry into the validity of a waiver of *Miranda* rights has two dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if "the totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran*, 475 U.S. 412, 421 (1986).  A determination of whether the waiver of *Miranda* rights is voluntary, knowing and intelligent thus is based on the totality of the circumstances.  Under this

approach, the Court must examine "several factors including the characteristics of the suspect, such as his [or her] age, intelligence, and education, and the details of the interrogation, such as whether the suspect was informed of his [or her] rights, the length of the detention and the interrogation, and the use or threat of physical force." *United States v. Nguyen*, 155 F.3d 1219, 1222 (10th Cir. 1998), *cert. denied*, 525 U.S. 1167 (1999). "An express written or oral statement or waiver by a defendant of his right to remain silent or of the right to legal assistance of counsel, though not conclusive, is 'usually strong proof of validity of that waiver.'" *United States v. Hack*, 782 F.2d 862, 866 (10th Cir.) (citation omitted), *cert. denied*, 476 U.S. 1184 (1986).

In the instant case, the undisputed facts establish that Mendivil signed a waiver of rights form, which stated: "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." In addition, it is undisputed that, while he was at the FBI office, the agents allowed Mendivil to use the restroom as needed and gave him something to eat and drink.

Moreover, Agent Nishida and Agent Medina presented credible testimony that Mendivil was advised of his rights twice, once when he was arrested and once at the commencement of the interview at the FBI office in Las Cruces. Agent Nishida presented credible testimony that he did not question Mendivil during the transport to Las Cruces. Agent Medina also presented credible testimony that, after signing the waiver of rights, Mendivil verbally indicated that he understood his rights and was willing to talk to the agents and answer their questions.

While Mendivil testified that he was arrested at 11:00 a.m., was transported to the Las Cruces FBI office at noon and was continuously questioned for seven hours until he signed the waiver form at 7:04 p.m., Agent Nishida testified that he arrested Mendivil at approximately 4:00 p.m. and Agent

Medina testified that Mendivil was arrested at approximately 5:00 p.m.  The documentary evidence establishes that Mendivil signed a waiver of rights at 7:04 p.m.   All of the testimony establishes that, once Mendivil was arrested, the arresting agents took Mendivil to the FBI office in El Paso for a restroom stop and then took him to the FBI office in Las Cruces.  The FBI Radio Log demonstrates that Agent Nishida began transporting Mendivil to Las Cruces at 5:37 p.m. and that Agent Nishida arrived at the Las Cruces FBI office with Mendivil at 7:00 p.m.  The log thus corroborates the agents' testimony.

Accordingly, the Court finds that Mendivil was arrested between 4:00 p.m. and 5:00 p.m., that, after a brief stop at the El Paso FBI office, Mendivil was transported to the Las Cruces FBI office where he arrived at approximately 7:00 p.m., that Mendivil signed a waiver of rights form minutes later at 7:04 p.m., that Mendivil was not questioned before he signed the waiver of rights and that Mendivil was treated humanely by the arresting and interviewing agents.  Given the totality of these circumstances, the Court finds that Mendivil's waiver of his *Miranda* rights was voluntary, knowing and intelligent.  Mendivil thus validly waived his rights before giving his statement to the agents.

## CONCLUSION

Mendivil was advised of his *Miranda* rights and validly waived those rights before giving his statement to FBI agents.  The statement thus was not obtained in violation of Mendivil's Sixth Amendment rights.  Accordingly, there is no basis to suppress his statement.

**IT IS THEREFORE ORDERED** that Defendant Martin Mendivil's Motion to Dismiss Post

Indictment Statement **[Doc. No. 291]** is hereby **DENIED**.


Dated this 6th day of December, 2004.


_____

MARTHA VÁZQUEZ
CHIEF UNITED STATES DISTRICT JUDGE


Attorneys for Plaintiff:
Ken Gonzales
John G. Crews, III

Attorney for Defendant Jose Francisco Diaz
Anthony White
Attorney for Defendant Edgar Lopez-Hernandez
Joe M. Romero
Attorney for Defendant Jessica Mendoza
Howard Anderson
Attorney for Defendant Jorge Torres-Laranega
Marcia Milner
Attorney for Martin Mendivil
Ken Del Valle