**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                                            Cr. No. 03-2112 MV

JORGE TORRES-LARANEGA, et al.,

      Defendants.

**<u>MEMORANDUM OPINION AND ORDER</u>**

**THIS MATTER** comes before the Court on Defendant Jessica Mendoza's Motion for a Judgment of Acquittal Pursuant to Rule 29 of the Federal Rules of Criminal Procedure, orally made at the close of the government's case on February 15, 2005.  The Court, having considered the motion, briefs, relevant law and being otherwise fully informed, finds that the motion is not well taken and will be **DENIED**.

**<u>BACKGROUND</u>**

Under 21 U.S.C. §846, Mendoza was charged in Count 2 of the Fourth Superseding Indictment with conspiracy to possess with intent to distribute 1,000 kilograms and more of marijuana within 1,000 feet of the real property of a school, contrary to 21 U.S.C. §§841(a)(1), 841(b)(1)(A), and 860(a), and within 1,000 feet of the real property comprising a truck stop, contrary to 21 U.S.C. §§841(a)(1), 841(b)(1)(A), and 849(a).  The Fourth Superseding Indictment alleged that the conspiracy began on June 8, 2002 and continued until November 19, 2003.

The Court held a jury trial in this matter, which commenced on January 19, 2005.  On February 15, 2005, at the close of the government's case-in-chief, Mendoza orally moved for a judgment of acquittal.  The Court took the motion under advisement.  Mendoza then rested her case without

presenting any evidence. Thereafter, on February 23, 2005, the jury returned a verdict of guilty as to

Mendoza on Count 2 of the Fourth Superseding Indictment.

## DISCUSSION

**I.**    **Standard on a Motion for Judgment of Acquittal Pursuant to Rule 29**

Rule 29 of the Federal Rules of Criminal Procedure provides in relevant part:

> (a) Before Submission to the Jury. After the government closes its evidence or after the close of all the evidence, the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction. . . .

> (b) Reserving Decision. The court may reserve decision on the motion, proceed with the trial (where the motion is made before the close of all the evidence), submit the case to the jury, and decide the motion either before the jury returns a verdict or after it returns a verdict of guilty . . . If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved.

In deciding a motion for a judgment of acquittal pursuant to Rule 29, the court "must determine

whether 'viewing the evidence in the light most favorable to the Government, any rational trier of fact

could have found the defendant guilty of the crime beyond a reasonable doubt.'" *United States v.

Delgado-Uribe*, 363 F.3d 1077, 1081 (10th Cir. 2004) (quoting *United States v. Vallo*, 238 F.3d

1242, 1246-47 (10th Cir.), *cert. denied sub nom.*, *Chino v. United States*, 532 U.S. 1057 (2001). In

reviewing the sufficiency of the evidence, "the court must consider the direct and circumstantial

evidence, as well as the reasonable inferences to be drawn from that evidence." *United States v.

Robinson*, 2004 WL 2005795, *1 (D. Kan. Aug. 17, 2004) (citing *United States v. Davis*, 1 F.3d

1014, 1017 (10th Cir. 1993)). In conducting its inquiry, the court does not "weigh conflicting evidence

[or] consider the credibility of witnesses. Instead, [the court] must simply determine 'whether [the]

evidence, if believed, would establish each element of the crime.'" *Delgado-Uribe*, 363 F.3d at 1082

(quoting *Vallo*, 238 F.3d at 1247).

The evidence to support a conviction "'must be substantial; . . . it must do more than raise a mere suspicion of guilt.'" *Robinson*, 2004 WL 2005795 at *1 (quoting *United States v. Torres*, 53 F.3d 1129, 1133-34 (10th Cir. 1995), *cert. denied*, 519 U.S. 890 (1996)).  Nonetheless, the evidence "'need not conclusively exclude every other reasonable hypothesis and it need not negate all possibilities except guilt.'" *Robinson*, 2004 WL 2005795 at *1 (quoting *United States v. Johnson*, 42 F.3d 1312, 1319 (10th Cir. 1994), *cert. denied*, 514 U.S. 1055 (1995)).

## II.   Elements of Conspiracy

In her motion for a judgment of acquittal, Mendoza argues that the evidence is insufficient to support a conspiracy conviction against her.  To prove conspiracy in violation of 21 U.S.C. §846, the evidence must establish:  "(1) an agreement with another person to violate the law, (2) knowledge of the essential objectives of the conspiracy, (3) knowing and voluntary involvement, and (4) interdependence among the alleged conspirators." *United States v. Carter*, 130 F.3d 1432, 1439 (10th Cir. 1997), *cert. denied*, 523 U.S. 1144 (1998).  "[T]he government may establish these elements by direct or circumstantial evidence." *United States v. Evans*, 970 F.2d 663, 669 (10th Cir. 1992), *cert. denied*, 507 U.S. 922 (1993).  The Tenth Circuit has stated:

> The jury may infer an agreement constituting a conspiracy [under §846] "from the acts of the parties and other circumstantial evidence indicating concert of action for the accomplishment of a common purpose."  Furthermore, "the jury may presume that a defendant is a knowing participant in the conspiracy when he acts in furtherance of the objective of the conspiracy."  The defendant's participation in or connection to the conspiracy need only be slight, so long as sufficient evidence exists to establish the defendant's participation beyond a reasonable doubt.'

*United States v. Johnston*, 146 F.3d 785, 789  (10th Cir. 1998) (citations omitted), *cert. denied*, 525 U.S. 1088 (1999).

Moreover, while "'mere association' with conspirators known to be involved with a crime" is insufficient to establish an agreement, "[a]n agreement to distribute drugs can sometimes 'rationally be

inferred' from 'frequent contacts' among the defendants and from 'their joint appearances at transactions and negotiations.'"  *Evans*, 970 F.2d at 669 (citations omitted).  Similarly, "[a] defendant need not 'know all the details or all the members of a conspiracy' to sustain a conspiracy conviction." *United States v. Silcock*, 61 Fed. Appx. 528, 530 (10th Cir. 2003) (citation omitted).  Rather, the defendant "must have a general awareness of both the scope and the objective of the enterprise to be regarded as a coconspirator."  *Evans*, 970 F.2d at 670.  Finally, "'[a] defendant's activities are interdependent if they facilitated the endeavors of other alleged conspirators or facilitated the venture as a whole.'"  *Silcock*, 61 Fed. Appx. at 530 (citation omitted).

## III.   The Instant Case

### A.   Evidence of a Conspiracy

At trial, the government presented evidence of events that occurred between June, 2002 and November 19, 2003 as follows.  The confidential informant, Yolanda Alarcon, testified that, in June, 2002, she met with codefendant Jorge Torres-Laranega, who asked her to drive a truck to Chicago.  Ms. Alarcon testified that it was her understanding that the truck was loaded with drugs and that Torres offered to pay her $15,000 to drive the truck.  Alarcon further testified that, later the same day, she picked up a purple truck in El Paso and moved it to a truck stop.  According to Alarcon, she moved that same purple truck three additional times: once in August or September, 2003, then in March, 2003 and finally on April 7, 2003, when she was stopped at the Anthony port of entry by MTD Officers Harry Sanchez and Ty Hamilton.

Officer Sanchez testified that, when he stopped Alarcon on April 7, 2003, he found a blue medical card belonging to codefendant Martin Mendivil, in addition to a log book containing Mendivil's handwritten name throughout the book and containing alleged coconspirator Guillermo Verdugo Jr.'s

("Guillermo") handwritten name on the front cover. The log book appears to document two trips made by Mendivil in the purple truck from Las Cruces to Chicago.

With regard to the first trip, the log book shows that Mendivil left Las Cruces on March 3, 2003, traveled through Albuquerque, Amarillo, Oklahoma City, Joplin, St. Louis and Auburn, arrived in Chicago on March 5, 2003, stayed in Chicago until March 10, 2003, departed Chicago on March 10, 2003, traveled through St. Louis, Joplin, and Oklahoma City and arrived in Santa Rosa, New Mexico on March 12, 2003.

When Torres was arrested, he had in his possession a driver's license, a social security card, a birth certificate and a Sam's Club card, all issued to an individual named Jesus Burciaga. The driver's license and the Sam's Club card displayed Torres' photograph. Evidence of the purchase history on the Sam's Club card in Burciaga's name shows that purchases were made with this card in Chicago on March 11, 2003.

With regard to the second trip, the log book shows that Mendivil left Las Cruces on March 21, 2003, traveled through Albuquerque, Amarillo, Oklahoma City, Joplin, Missouri and St. Louis, arrived in Chicago on March 23, 2003, stayed in Chicago "off duty" until he departed on March 29, 2003, traveled through St. Louis, Joplin and Oklahoma City and arrived in Amarillo on March 31, 2003. Evidence of the purchase history on the Sam's Club card in Burciaga's name shows that purchases were made with this card in Chicago on March 25, 2003. In addition, records from the Best Western River North Hotel in Chicago list as a guest Martin Mendivil, residing at 109 Linda Vista Drive, Sunland Park, New Mexico, from March 26 to March 27, 2003 and from March 28 to March 29, 2003. Records for the same hotel also list as guests codefendant Gabriel Fernandez and Guillermo from March 26 to March 29, 2003. The log book and the hotel records corroborate Alarcon's testimony that, in March, 2003, she moved the purple truck to the "ranchito" in Las Cruces in connection with a trip that

Guillermo took to Chicago. All of this evidence, taken together, creates a reasonable inference that, twice in March, 2003, Mendivil drove a truck loaded with marijuana from Las Cruces to the Chicago area, and that other members of the alleged conspiracy, including Torres, Fernandez and Guillermo, were in Chicago during the same time periods as Mendivil.

Alarcon testified that, on April 7, 2003, she met with Fernandez and Torres at a parking lot in El Paso, where Torres instructed her to move the same purple truck to the ranchito in Las Cruces and gave her the keys and $1,000. Alarcon further testified that she drove the truck and that codefendant Edgar Lopez-Hernandez and Guillermo followed the truck in Lopez's red Crown Victoria. According to Alarcon, she stopped on the ramp before reaching the Anthony port of entry because she did not have a log book or a bill of lading and asked Lopez and Guillermo to purchase these at the truck stop and bring them to her. Alarcon testified that, when they brought her the log book and blank bill of lading, she asked Lopez what was in the back of the truck so that she could fill out the bill of lading. Alarcon testified that, although Lopez told her that there were eighteen dryers in the truck, she got confused and wrote "eighteen washers" on the bill of lading. Officer Sanchez found this bill of lading in the purple truck when he stopped Alarcon and seized the truck at the port of entry.

Alarcon testified that, on May 18, 2003, Lopez asked her to move a red truck from the Pilot Truck Stop to a pallet shop and back to the TA Truck Stop in Las Cruces. Documentary evidence established that, in February, 2003, codefendant Jose Francisco Diaz, d/b/a Stallion Transportation, had purchased this truck, registered it with the Department of Motor Vehicles and purchased, in cash, insurance on the truck. Documentary evidence further established that, on May 14, 2003, Diaz reinstated the insurance policy on this truck. According to Alarcon, Lopez advised her that Torres told Lopez to get someone to drive the truck. She testified that, at first, Torres suggested an individual named Rito Roman, but that Lopez did not like Roman and, for this reason, instead asked Alarcon to

move the truck. Testimony of surveillance agents corroborated Alarcon's testimony that she moved the truck to the pallet shop, where the truck was loaded, and moved the truck from the pallet shop to the TA Truck Stop in Las Cruces. Testimony of surveillance agents established that Lopez and Mendivil met at the TA Truck Stop, Lopez gave Mendivil the keys to the red truck and Mendivil drove the truck north to the Las Cruces checkpoint on I-25. Border Patrol Agent Manuel Casares testified that, at the checkpoint, he questioned Mendivil regarding his load. Agent Casares testified that Mendivil advised that he was hauling "lavadoras," the Spanish word for washers. According to Agent Casares, he asked Mendivil for the bill of lading, which showed that Mendivil was carrying red chile. Agent Casares testified that, when he told Mendivil what the bill of lading stated, Mendivil said that it was odd because he was hauling washer/dryers "the last time." The red truck then was searched, 1,417 kilograms of marijuana were found, the red truck was seized and Mendivil was arrested.

During the search of the truck, a receipt for the TA Truck Stop in Amarillo, dated April 19, 2003, and a receipt for the Will Rogers Turnpike in Oklahoma, also dated April 19, 2003, were found. Records from the Midway Airport, Chicago Best Western Hotel show as a guest Martin Mendivil, residing at the Sunland Park address, from April 14 to April 19, 2003; from April 17 to April 18, 2003; and from April 11 to April 12, 2003. In addition, records from the Best Western River North Hotel show as a guest Martin Mendivil, residing at the same address, from April 12 to April 14, 2003. Records from the same hotel also show as a guest Fernandez from April 11 to April 14, 2003. A reasonable inference can be drawn from all of this evidence, taken together, that Mendivil transported a marijuana load in the red truck in April and that there was a cover load of "lavadoras" in the truck during that trip.

DEA Agent Jacinto Flores testified that, after the May 18, 2003 seizure, he tried to locate Diaz, the registered owner of the seized red truck. Agent Flores testified that he could not locate Diaz or

Stallion Transportation at the address listed for Stallion Transportation, which appeared to be a residence belonging to a woman named Veronica Villalobos. Agent Flores further testified that Diaz's attorney called him and subsequently came to his office with Diaz in order to retrieve the red truck.

According to Agent Flores, Diaz presented a document showing that Diaz had leased the red truck to an individual named Jorge Reyes on April 14, 2003. The lease document, which was admitted into evidence, was notarized and contained the signature of a notary public named Lorena Garcia. Ms. Garcia testified that she did not recognize the lease document and had never notarized the lease document, that the signature on the document was not hers and that someone else must have taken her stamp and affixed it to the document. In addition, the lease document states that it is for a period of three months, from May 1, 2003 to September 1, 2003. This, however, is a period of four months. Similarly, the word "contract" is misspelled in the document. The agreement also contains a condition that the contract will be "nulled *[sic]* and voided" if the tractor trailer is used in any way in illegal activity. Moreover, the receipts dated April 19, 2003 that were found in the red truck, viewed together with the hotel records showing Mendivil as a guest in Chicago from April 14 to April 19, 2003, suggest that, on April 14, 2003, the purported date of the lease, the red truck was in Chicago and thus would not have been available to lease. The totality of this evidence creates a reasonable inference that the lease document was not legitimate but rather was fraudulently prepared after the May 18, 2003 seizure in order to retrieve the red truck.

On July 23, 2003, the FBI intercepted a telephone call between Torres and an individual identified as "Primo," who asked Torres for "paper" because he was losing his position. Immediately thereafter, the FBI intercepted a telephone call between Torres and Mendoza in which Torres told Mendoza that he needed the paper for "Martin." A rational trier of fact could infer from this evidence that Primo was being held accountable for the marijuana lost in the May 18, 2003 seizure and that

Torres and Mendoza were attempting to obtain documentation of the seizure to prove that the marijuana had not been stolen.

On July 30, 2003, the FBI intercepted a telephone call between Torres and Mendoza during which they discussed someone named "Martin."  Mendoza said that Martin is sick with a fungus on his arm, that he has diabetes, that they have not attended to him yet and that the jail is very ugly.  In addition, Mendoza said that "she" told "Hill" that she wanted her money back and that someone had recommended another attorney.  As Mendivil was incarcerated at the time of this conversation, there is a reasonable inference that he is the "Martin" whom Torres and Mendoza were discussing.

A lease document admitted into evidence shows that Diaz, d/b/a Stallion Transportation, leased a white truck from an individual named Steven Broussard on May 21, 2003, three days after the seizure of the red truck.  Documentary evidence also established that, on May 23, 2003, Steven Broussard paid $4,220 in cash to insure the white truck and that, on May 28, 2003, Steven Broussard registered the white truck.  The registration contains the notation:  "unknown milexplaitocustagreed" and is signed "J. Torres."

Police Officer Peter Michaels testified that, on June 12, 2003 in Cicero, Illinois, he conducted a consensual search of this same white truck.  At the time, an individual named Frank Mendivil was driving the white truck.  Officer Michaels testified that he found in the truck eighteen Maytag boxes.  He further testified that fourteen of the boxes contained commercial dryers and that four of the boxes were empty.  According to Officer Michaels, the empty boxes had pallets at the bottom covered with coffee grinds and laundry detergent.  Records of the purchase history of the Sam's Club card in the name of Burciaga show a purchase at the Sam's Club in Cicero, Illinois on June 27, 2003.  This evidence suggests that Frank Mendivil was transporting a marijuana load and that at least one member of the alleged conspiracy, Torres, was in the Chicago area at approximately the same time as the truck.

Alarcon testified that, on July 9, 2003, Torres asked her to come to Chicago to drive a truck from Chicago to Laredo and back.  Alarcon further testified that she received a wire transfer in the amount of $700 from Torres in order to fly to Chicago.  The FBI intercepted telephone calls in which Alarcon discussed her flight arrangements with Mendoza and in which Alarcon discussed with Torres the driving route from Chicago to San Antonio.  According to Alarcon, Torres promised to pay her between $15,000 and $20,00 to drive a loaded truck from San Antonio to Chicago.

Alarcon testified that, on July 10, 2003, she flew to Chicago where she met Torres, Mendoza, codefendant Garry Lee Ragan, codefendant Jose Luis Barraza ("Jose Luis"), codefendant Juan Antonio Barraza ("Juan Antonio") and Fernandez.  Testimony of surveillance agents established that this group was traveling in a Chevy Tahoe with New Mexico plates and registered to Mendoza's sister.  According to Alarcon, they all drove together to an apartment on Kildare Street.  Surveillance agents took a photograph, admitted into evidence, of several individuals outside of the apartment, one of whom was identified by FBI Agent Andy Armijo as Torres.

Alarcon was wearing a wire, and the FBI recorded a conversation that occurred during the drive. In that conversation, Mendoza was speaking with someone on the telephone about a ticket that Juan Antonio had received in Wetherford, Texas for failure to display insurance.  During the call, Mendoza referred to Juan Antonio as "one of my drivers" and said that her "boss" wanted to know what "failure to display insurance" means.  She relayed to Torres that there was a fine that needed to be paid.  Torres instructed her to pay the fine.

Texas Department of Public Safety Officer John Forrest testified that, on July 3, 2003, he ticketed Juan Antonio.  The ticket, which was admitted into evidence, shows that Juan Antonio was driving the white truck and that the load in the truck was dryers.  In addition, during the search of the white truck pursuant to the seizure on July 14, 2003 (discussed below), a toll receipt for the Oklahoma

Turnpike dated July 4, 2003 and a sales receipt from the TA Truck Stop in Gary, Indiana dated July 5, 2003 were found.

Alarcon testified that, on July 10, 2003, after arriving at the Kildare apartment, she, Torres, Mendoza, Fernandez, Ragan, Jose Luis and Juan Antonio went to a currency exchange, where Juan Antonio wired $7,000 to his family. According to Alarcon, Juan Antonio told her that he received this money from Torres as payment for a prior trip that he had made for Torres from El Paso to Chicago. Alarcon further testified that Jose Luis and Juan Antonio showed her the bill of lading for this prior trip. Alarcon testified that she tore up the bill of lading and then gave the pieces to the FBI. The bill of lading, the pieces of which were admitted into evidence, is dated July 4, 2003 and shows a load of eighteen industrial dryers. All of this evidence, taken together, creates a reasonable inference that, for Torres, Juan Antonio and Jose Luis had driven the white truck, loaded with marijuana and dryers, through Texas on July 3, 2003, through Oklahoma on July 4, 2003 and to Gary, Indiana on July 5, 2003.

Alarcon testified that, on July 11, 2003, she, Ragan and Jose Luis traveled in the white truck from Chicago to San Antonio and that Mendoza, Torres, Fernandez and Juan Antonio followed them in the Chevy Tahoe. According to Alarcon, the group met at a hotel in San Antonio and, the following day, went to a store where Alarcon cashed a money order in the amount of $1,000 that Mendoza had given her. Alarcon further testified that, thereafter, the group went to a store where Torres and Mendoza purchased a typewriter. A receipt from an Office Max store in San Antonio reflecting the purchase of a typewriter on July 12, 2003 was admitted into evidence. In addition, Agent Henry Alba testified that he observed the SUV that he was assigned to watch in the parking lot of the Office Max store and observed a group exiting the store with a Brothers box that appeared to contain a typewriter. Alarcon testified that the group returned to the hotel, where Mendoza typed up a bill of lading showing a load

-11-

of eighteen dryers.

Testimony of surveillance agents established that Jose Luis and Juan Antonio then drove the white truck to a warehouse in Edinburgh called Show Trucks of Texas, a body shop for trucks. Testimony of surveillance agents further established that Jose Luis and Juan Antonio unhitched the trailer, traveled in the tractor to a restaurant, returned to the warehouse, hitched the trailer to the tractor, and drove the white truck back to San Antonio. Alarcon testified that the group met in San Antonio late that night. Testimony of surveillance agents established that the group left San Antonio, Jose Luis and Juan Antonio in the white truck and the others in the Chevy Tahoe. Alarcon testified that she, Torres, Mendoza, Fernandez and Ragan stopped in Dallas for the night. Records of La Quinta Hotel in Dallas list as guests Jesus Burciaga and Gaby Fernandez for July 13 to July 14, 2003.

Sergeant Noel Sanchez testified that, in the early morning of July 14, 2003, in Gary, Indiana, he stopped and searched the white truck driven by Jose Luis and Juan Antonio. The truck contained 777 kilograms of marijuana, fourteen boxes containing dryers and four empty boxes. The white truck then was seized. Alarcon testified that, after the seizure, Jose Luis and Juan Antonio called Torres to tell him about the seizure and Torres told the rest of the group riding in the car that "they got the guys."

On July 23, 2003, the FBI intercepted a telephone call between Torres and an unidentified male with a (956) area code. The unidentified male asked Torres about getting something to document what happened "that day." Torres explained that, because no one was arrested, there was no report that states who was arrested and with how much. The unidentified male said, "these people are thinking something bad." A reasonable inference can be drawn that they were discussing documentation to show that there was a legitimate seizure of the marijuana.

On July 24, 2003, the FBI intercepted a telephone call between Torres and Jose Luis during which Torres gave Jose Luis flight information. Later that day, the FBI intercepted another telephone

call between Mendoza and an agent at Southwest Airlines during which Mendoza, representing herself as "Mrs. Barraza," made reservations for Jose Luis to fly from El Paso to Chicago the next day, July 25, 2003.  Records from Southwest Airlines reflecting that Jose Luis was on the flights for which Mendoza made him reservations were admitted into evidence.

On July 29, 2003, the FBI intercepted a telephone call between Torres and Jose Luis during which Torres asked Jose Luis where the load was going from and Jose Luis replied that it was going from Indianapolis to Wisconsin.  Jose Luis said that he was going to say that he picked it up there. Torres said, "they're going to say, why did you come up on the 57?"  Jose Luis responded, "they don't know that I came up on the 57."  Torres then instructed Jose Luis to say that he met another truck at the Petro and they changed trailers.

Police Officer Irving Givens testified that Jose Luis arrived at the police station  with a letter to retrieve the white truck.  The letter, which was admitted into evidence, is on Broussard Carriers letterhead and reflects a telephone number of (915) 276-4279.  The letter directs that the truck is to be released to his attorney, Michael Holzmen, and the designated driver, Jose Luis Barraza.  The letter appears to be signed by Steven Broussard and notarized by Scott Kinney.  Scott Kinney, however, testified that he did not notarize this document, that the signature on the document is not his and that the expiration date on the notary stamp is incorrect. When Mendoza was arrested, she had in her possession a written notation of the telephone number from the Broussard Carriers letterhead described as "prepaid."  This evidence, taken together, creates a reasonable inference that the letter was not legitimate but rather was fraudulently prepared after the seizure in order to retrieve the white truck.

On August 5, 2003, the FBI intercepted a telephone call between Torres and Ragan during which Ragan told Torres, "We are here picking up the truck sir."  Ragan told Torres that he received a receipt.  Torres asked Ragan what the receipt said.  Ragan then read him the receipt.  Ragan noted

that, on the top, the receipt said, "narcotic hold."  Ragan said, "it says about the pharmacy."  Torres

asked, "Does it say how much it had?" Ragan replied, "No, no it does not say anything."  The release

paperwork from Republic Frame and Axle, the company responsible for towing the white truck after

the July 14, 2003 seizure, was admitted into evidence.  The information which Ragan read to Torres

over the telephone was identical to the information contained in the release paperwork.  The reasonable

inferences to be drawn from all of this evidence are:  Torres sent Jose Luis to pick up the white truck;

Mendoza arranged for the trip; Torres instructed Jose Luis to fabricate a story explaining how he came

to be in possession of a tractor containing marijuana; Torres and Mendoza provided Jose Luis with the

letter purportedly signed by Steven Broussard; and Torres was seeking documentation of the seizure in

order to prove that the load was seized by law enforcement.

Alarcon testified that, sometime after July 15, 2003, Torres instructed her to register a truck in

her name that she could use for legitimate loads and that Torres could borrow for drug loads to Chicago.

Alarcon further testified that Mendoza gave her instructions to get papers for the truck at the house in

Mesquite where Mendoza lived with Torres' father, which she did.  Also according to Alarcon, Torres

instructed her to register the truck with Land Star Trucking, using Diaz as a reference.  Alarcon testified

that Land Star was unable to register the truck and that Torres instructed her to register it with Wild

West Trucking instead.  According to Alarcon, Wild West required a refrigerated truck which Torres

said he would buy.  Alarcon testified that she and Torres went to Torres' house at 8377 Roseway in El

Paso, where Torres' wife, codefendant Rebecca Ramirez, gave them money to purchase the truck, and

then purchased a gray, refrigerated truck.

Alarcon testified that, on July 30, 2003, because the gray truck was not working properly, she

brought it to a repair shop where she met Torres and Diaz.  According to Alarcon, Diaz backed the truck

up at the repair shop.  Testimony of surveillance agents established that there were two vehicles at the

repair shop that day: a pearl Escalade and a gray Ford F150 pickup truck. Alarcon testified that Torres had told her that the pearl Escalade belonged to him. The pickup truck was registered in Diaz's name.

Testimony of surveillance agents established that, on August 2, 2003, the gray truck was observed at the Las Cruces Tortillaria in El Paso. When the gray truck was searched on September 12, 2003 (discussed below), it contained a cover load of tortilla chips and pork rinds. Upon his arrest, Diaz was found in possession of a business card from the Las Cruces Tortillaria.

On August 6, 2003, the FBI intercepted a call between Torres and codefendant Raul Espinosa during which Torres said, "Joe already went to pick up the big truck." Testimony of surveillance agents established that, on August 6, 2003, Diaz and Torres were observed at the Flying J Truck Stop, jump starting the gray truck. Testimony of surveillance agents further established that Diaz was driving a black Escalade and that Torres was driving a white Corsica.

Also on August 6, 2003, the FBI intercepted a call between Espinosa and an individual named Lalo during which Espinosa instructed Lalo to "put as many pallets that are possible . . . over on top of those tires." Testimony of surveillance agents established that, on August 6, 2003, a red pickup truck arrived at the 405 Cineque Way residence with pallets loaded on top of other items in the bed of the pickup truck.

On August 7, 2003, the FBI intercepted a telephone call between Torres and Espinosa in which Torres said that he was leaving that day. Testimony of surveillance agents established that, on August 7, 2003, the gray truck was moved to a Diamond Shamrock station in El Paso. With the gray truck, surveillance agents also observed a pearl Escalade driven by a man whose description fits that of Torres.

Also on August 7, 2003, El Paso police officers were observing a residence at 405 Cineque Way when they saw four individuals run out of the house. One of the individuals, who ran into a truck

parked on the property, was Espinosa.  Upon Mendoza's arrest, she had in her possession the title to the truck in which Espinosa was hiding.  The officers subsequently seized 523 kilograms of marijuana that they found inside the residence.

In calls between Torres and Espinosa intercepted by the FBI during the period from August 1 to August 7, 2003, Espinosa told Torres that the boxes are too small for the "dulces," or candies, and described the boxes as being 18" x 18" x 16".  Torres instructed Espinosa to use "clean" and "bigger" boxes.  Espinosa also told Torres that they had "the stuff," "the boxes."  In addition, Torres instructed Espinosa to tell someone named Chapo that they have "1,400."  During the officers' search of the house at 405 Cineque Way on August 7, 2003, they found 523 kilograms, or 1,200 pounds, of marijuana.  The marijuana was in boxes that were 18" x 18" x 16", and the boxes were bulging.  The officers also found larger, empty boxes.  In addition, the officers found the target telephone which the FBI had provided to Alarcon to give to Torres and on which the FBI had been intercepting calls.  A reasonable inference can be drawn that the conversations between Torres and Espinosa were about the 1,200 pounds of marijuana discovered at 405 Cineque Way on September 7, 2003.

Alarcon testified that, on September 9, 2003, Torres instructed her to move the gray truck and that, on September 10, 2003, she moved the truck from the TA Truck Stop in Las Cruces to the Love's Truck Stop in El Paso. Testimony of surveillance agents corroborated Alarcon's testimony.  Alarcon further testified that she met Fernandez and codefendant Cesar Miramontes at the Love's Truck Stop.

Testimony of surveillance agents established that the gray truck then was moved from the Love's Truck Stop to a warehouse in El Paso that was near train tracks, a petroleum refinery and Interstate 10. The FBI intercepted a telephone call that same day between Diaz and Miramontes during which Diaz instructed Miramontes to "go see the place and then . . . leave the vehicle there where you're going to park it."   Miramontes replied, "we already saw it, I told you."   Diaz asked, "how is it?"

-16-

Miramontes replied, "it's fine, it's right there . . . it's near the . . . Petroleum that's near the freeway."
Diaz asked, "But . . . is it right next to the dimer?" Miramontes replied, "almost." Miramontes also
said, "By the tracks . . . where the railroad tracks are at." Diaz asked, "is it peaceful?" Miramontes
replied, "Yes, I've gone over there and it's really nice."

Also on September 10, 2003, the FBI intercepted several calls between Torres and Fernandez.
The calls establish that Fernandez was with Miramontes. During one call, Torres instructed Fernandez
to "wait there, Joe is going to go by in the black truck and then you guys go with him." As set forth
above, a black Escalade is registered in Diaz's name. Approximately ten minutes later, the FBI
intercepted a call between Torres and Diaz during which Diaz said that he is "here at the telephones."
Torres told him, "they're coming out, be on the look out. . . . Go there by where the big ones come out."
This evidence leads to the reasonable inference that Diaz was planning to meet Miramontes and
Fernandez with the gray truck that had been moved to the warehouse on Alameda.

On September 11, 2003, the FBI intercepted a telephone call between Torres and Mendoza
during which Mendoza said, "you gotta see it to see if you like it," and Torres responded, "you already
know what you need to do, I can't be telling you what . . . You're the one in charge of that department."
Mendoza told Torres to "buy some right there and I'm going to make a copy of this one." She also
asked whether they are "going to fill it out in the typewriter and not in the computer?" Torres responded,
"on the typewriter, I'll buy one right now." Mendoza then said, "they're leaving at 7:30, just let me go
over there and make some copies." This evidence suggests that Mendoza was in the process of
preparing a bill of lading for a load that was about to be transported.

Texas Department of Safety Officer Juan Briano testified that, on September 12, 2003, he
conducted an abandoned vehicle inspection of the gray truck, which was parked on Tower Trail Lane
in El Paso. Officer Briano testified that he found in the truck 340 kilograms of marijuana in loose boxes

along with loose boxes containing tortilla chips and pork rinds.

At the same time that Officer Briano was conducting his inspection, the FBI intercepted telephone calls between Torres and Fernandez. During the first call at approximately 11:30 a.m., Torres told Fernandez, "I need for you to move the truck, right now." During a second call approximately one-half hour later at noon, Fernandez told Torres, "the state trooper is there where the big vehicle is at. They opened the box." Fernandez further told Torres that the dogs and the cops were there and that the back door was open. During the next call approximately one-half hour later at 12:30 p.m., Fernandez told Torres that "they" were on top, brought dogs and were unloading. Torres instructed Fernandez to stay there and watch from afar, not to get close to the truck, to sit down like he was drinking a soda and "just looking." Torres asked, "and . . . Joe and those guys aren't answering, right?" Fernandez replied, "They haven't called me or anything." During the next call at 1:45 p.m., Fernandez told Torres that the "narcs" were still there, that they had been inside the tractor and the trailer, but that they had not taken anything out. Three minutes later, there was another call during which Torres asked, "but nothing was on pallets, right? Everything was loose?" Fernandez responded, " Yes, everything was loose." Fernandez also said, "I put that shit in the back and then I put all the pork rinds on top of that shit and on the side where it couldn't be seen." One minute later, there was another call during which Torres told Fernandez, "just be on the look out, if nothing happens and everything turns out all right, I'll give each of you $20,000, you and the other guy."

Minutes later, the FBI intercepted calls between Torres and Alarcon. As set forth above, Alarcon was the registered owner of the gray truck. Torres informed Alarcon that the officers were towing the gray truck away and instructed Alarcon to say that, as far as she knew, her truck was still at the TA. Torres further instructed Alarcon to say that the guy who was cleaning the truck has a key and that he might know something about it. In a later call, Alarcon advised Torres that the trucking

company had called her and said that customs had advised that they had a truck from Wild West. Alarcon further stated that she had told Wild West that her truck was at the TA, that she had given the keys to a man who was going to clean the carpet and detail the inside and that, if he had moved it, he had done so without her permission. Alarcon also told Torres that Wild West was going to report the truck stolen. Torres told Alarcon to remember the name "Jose Lopez" and said he would have some business cards done with the telephone number 479-5310. On the following day, September 13, 2003, the FBI intercepted another telephone call between Torres and Alarcon during which Torres told Alarcon that he would send with Fernandez a business card for Jose Lopez. Alarcon testified that she received the business card and a receipt in the amount of $300 for a detailing job. These items were admitted into evidence. This evidence demonstrates that Torres instructed Alarcon to give a fabricated story to the authorities to explain how the gray truck ended up on Tower Trail Lane loaded with marijuana. In addition, the evidence shows that Torres provided Alarcon with fraudulent documents, *i.e.*, a false business card and a false receipt, in order to corroborate the fabricated story.

On September 19, 2003, the FBI intercepted a telephone call between Torres and Alarcon during which Torres instructed Alarcon to retain a lawyer to represent her on this case and to tell the lawyer that she needed copies to see what happened. Alarcon testified that Torres, through Mendoza, provided her with $1,000 to hire a lawyer. A reasonable inference can be drawn from this evidence that Torres was enlisting Alarcon to obtain documentation of the law enforcement seizure.

Alarcon testified that, sometime after the September 12, 2003 seizure of the gray truck, Torres talked to her about registering another truck. Alarcon further testified that she talked to Mendoza about obtaining insurance for this truck. According to Alarcon, Mendoza told her that she had not yet received the insurance refund for the white truck and that, when she received this refund, she would be able to insure another truck. Testimony of insurance agents established that, in October or November 2003,

an insurance refund check was distributed to and endorsed by Steven Broussard and Diaz, d/b/a Stallion Transportation.  This evidence establishes a connection among Torres, Mendoza and Diaz.

As summarized above, there is direct and circumstantial evidence that the codefendants and others worked together to prepare, load and transport trucks carrying marijuana from the El Paso/Las Cruces area to the Chicago area.  The evidence includes testimony, recorded telephone calls, photographs and other documentary evidence establishing that trucks were routinely purchased, registered, insured, moved, loaded with marijuana and driven to the Chicago area.  This evidence also demonstrates a pattern that, when one truck was seized by law enforcement, efforts were made to: (1) procure another truck; (2) retrieve the seized truck; and (3) document that the seizure was legitimate, thereby proving that the load therein was not stolen by those responsible for loading and transporting it.  This evidence was sufficient to allow a rational trier of fact to infer an agreement constituting a conspiracy to possess with intent to distribute 1,000 kilograms and more of marijuana.

### B.    Evidence of Mendoza's Connection to the Conspiracy

The government's case, as summarized above, contains the following evidence of Mendoza's participation in the conspiracy.  As set forth above, the evidence established that, on July 23, 2003, immediately after intercepting a telephone call between Torres and an individual identified as "Primo" during which Primo asked Torres for "paper," the FBI intercepted a telephone call between Torres and Mendoza in which Torres told Mendoza that he needed the paper for "Martin."  A rational trier of fact could infer from this evidence that Primo was being held accountable for the marijuana lost in the May 18, 2003 seizure and that Torres and Mendoza were attempting to obtain documentation of the seizure to prove that the marijuana had not been stolen.

Then, on July 30, 2003, the FBI intercepted a telephone call between Torres and Mendoza during which they discussed someone named "Martin."  Mendoza said that Martin is sick with a fungus

-20-

on his arm, that he has diabetes, that they have not attended to him yet and that the jail is very ugly.  In addition, Mendoza said that "she" told "Hill" that she wanted her money back and that someone had recommended another attorney.  There is a reasonable inference that Torres and Mendoza were discussing Martin Mendivil, the driver of the truck seized on May 18, 2003.

Moreover, it was Mendoza who discussed with Alarcon her flight arrangements for the trip to Chicago in July and approved the ticket price.  Alarcon's testimony established that Mendoza was one of the individuals who met Alarcon when she arrived in Chicago on July 10, 2003.  This testimony was corroborated by surveillance agents who observed a second female along with Alarcon.  The evidence established that Mendoza was part of the group traveling in a Chevy Tahoe with New Mexico plates and registered to Mendoza's sister.

The FBI recorded a conversation during the drive in which Mendoza was speaking on a cellular telephone with someone about a ticket that Juan Antonio had received in Wetherford, Texas for failure to display insurance.  During the call, Mendoza referred to Juan Antonio as "one of my drivers" and said that her "boss" wanted to know what "failure to display insurance" means.  She relayed to Torres that there was a fine that needed to be paid.  Torres instructed her to pay the fine.

The testimony of Officer Forrest confirmed that, on July 3, 2003, he had ticketed Juan Antonio.  The ticket, which was admitted into evidence, shows that Juan Antonio was driving the white truck and that the load in the truck was dryers.  In addition, during the search of the white truck pursuant to the seizure on July 14, 2003, a toll receipt for the Oklahoma Turnpike dated July 4, 2003 and a sales receipt from the TA Truck Stop in Gary, Indiana dated July 5, 2003 were found.  Alarcon testified that, on July 10, 2003,  Juan Antonio told her that Torres had paid him $7,000 for a prior trip he had made in which the cover load was dryers.  This evidence suggests that, when he received the ticket for which Mendoza was making inquiries and arranging for payment, Juan Antonio was driving the white truck,

-21-

loaded with marijuana and dryers.

Alarcon testified that, on July 11, 2003, she, Ragan and Jose Luis traveled in the white truck from Chicago to San Antonio and that Mendoza, Torres, Fernandez and Juan Antonio followed them in the Chevy Tahoe. According to Alarcon, the group met at a hotel in San Antonio and, the following day, went to a store where Alarcon cashed a money order in the amount of $1,000 that Mendoza had given her. The evidence, including Alarcon's testimony, testimony of surveillance agents and a sales receipt, establishes that Torres and Mendoza then purchased a typewriter on July 12, 2003. Alarcon testified that she observed Mendoza use this typewriter to prepare a bill of lading showing a load of eighteen dryers.

Testimony of surveillance agents established that Jose Luis and Juan Antonio drove the white truck to a warehouse in Edinburgh where they unhitched the trailer, traveled in the tractor to a restaurant, returned to the warehouse, hitched the trailer to the tractor, and drove the white truck back to San Antonio. Alarcon testified that the group met in San Antonio late that night. Testimony of surveillance agents established that the group left San Antonio, Jose Luis and Juan Antonio in the white truck and the others in the Chevy Tahoe. Alarcon testified that she, Torres, Mendoza, Fernandez and Ragan stopped in Dallas for the night. Records of La Quinta Hotel in Dallas list as guests Jesus Burciaga and Gaby Fernandez for July 13 to July 14, 2003.

Sergeant Noel Sanchez testified that, in the early morning of July 14, 2003, in Gary, Indiana, he stopped and searched the white truck driven by Jose Luis and Juan Antonio. The truck contained 777 kilograms of marijuana, fourteen boxes containing dryers and four empty boxes. The white truck then was seized. Alarcon testified that, after the seizure, Jose Luis and Juan Antonio called Torres to tell him about the seizure and Torres told the rest of the group riding in the car, which included Mendoza, that "they got the guys."

On July 24, 2003, the FBI intercepted a telephone call between Mendoza and a Southwest Airlines agent during which Mendoza, representing herself as "Mrs. Barraza," made reservations for Jose Luis to fly from El Paso to Chicago the next day, July 25, 2003. The evidence established that Jose Luis did in fact travel to Chicago where he went to the police station and presented an apparently fraudulent letter directing that the white truck be released to him. The letter was on Broussard Carriers letterhead and reflected a telephone number of (915) 276-4279. When Mendoza was arrested, she had in her possession a written notation of this telephone number described as "prepaid." This evidence, taken together, creates a reasonable inference that Torres sent Jose Luis to pick up the white truck; Mendoza arranged for the trip; and Torres and Mendoza provided Jose Luis with the letter purportedly signed by Steven Broussard.

Alarcon's testimony established that it was Mendoza who gave her instructions to travel to Mendoza's house to get papers for the truck that Torres had instructed Alarcon to register in her name. Similarly, Alarcon's testimony established that it was Mendoza who provided her with $1,000 to retain an attorney after Torres instructed Alarcon to do so.

On September 11, 2003, the FBI intercepted a telephone call between Torres and Mendoza during which Mendoza said, "you gotta see it to see if you like it," and Torres responded, "you already know what you need to do, I can't be telling you what . . . You're the one in charge of that department." Mendoza told Torres to "buy some right there and I'm going to make a copy of this one." She also asked whether they are "going to fill it out in the typewriter and not in the computer?" Torres responded, "on the typewriter, I'll buy one right now." Mendoza then said, "they're leaving at 7:30, just let me go over there and make some copies." This evidence suggests that Mendoza was in the process of preparing a bill of lading for a load that was about to be transported. As set forth above, the next day, September 12, 2003, the gray truck was discovered with 340 kilograms of marijuana along with a cover

load of pork rinds and tortilla chips.  Moreover, this evidence establishes that Mendoza's "department" was the processing of documents used in furtherance of the conspiracy.

Also after the September 12, 2003 seizure of the gray truck, Alarcon testified that she talked to Mendoza about obtaining insurance for another truck that Torres had asked Alarcon to register. According to Alarcon, Mendoza told her that she had not yet received the insurance refund for the white truck and that, when she received this refund, she would be able to insure another truck.  Testimony of insurance agents established that, in October or November 2003, an insurance refund check was distributed to and endorsed by Steven Broussard and Diaz, d/b/a Stallion Transportation.  This evidence establishes a connection among Torres, Mendoza and Diaz.

Upon her arrest, Mendoza was found in possession of a small spiral notebook containing: the DOT and ICC numbers of the red truck that was seized on May 18, 2003; the VIN number for the black Escalade that was registered to Diaz; and a list of what appear to be expenditures, including " Yolanda 2290" (a tax document needed to register the gray truck), $30 to Yolanda for "truck start"  (on September 10, 2003, when Alarcon moved the gray truck from the TA Truck stop to the Love's Truck Stop, the battery needed to be jump started, which cost $30); and " Yolanda titles" (Yolanda registered the gray truck in her name).  When she was arrested, Mendoza also had in her possession a scrap of newspaper containing the names of various members of the conspiracy, including Memo, Garry, Gusano, Jose Luis and Gaby, the name "Meny," which was the name on one of the boxes found at 405 Cineque Way on August 7, 2003, and the telephone number from the Broussard Carriers letterhead noted as "prepaid."  Mendoza also was arrested in possession of the title to the truck parked at 405 Cineque Way in which Espinosa was hiding on August 7, 2003 when officers searched the premises and the title to another vehicle that was not registered in her name.  Finally, Mendoza had in her possession at the time of her arrest one of the cellular telephones that the FBI had provided to Alarcon to provide

to members of the conspiracy.

In the instant case, there is direct and circumstantial evidence that Mendoza knowingly participated in and facilitated the process of procuring, registering and insuring trucks to be used to transport marijuana. In addition, there is direct and circumstantial evidence that, when one truck was seized by law enforcement, Mendoza knowingly participated in and facilitated the process of procuring another truck, retrieving the seized truck, and obtaining documentation that the seizure was legitimate. The evidence in the instant case was sufficient to permit a rational juror to find that Mendoza's activities with regard to managing funds, keeping records, preparing, obtaining, and providing documents used in furtherance of the conspiracy, making travel arrangements for members of the conspiracy and handling the payment of fines received by members of the conspiracy, viewed together with all of the other evidence against her, connected her to the conspiracy to possess with intent to distribute 1,000 kilograms and more of marijuana.

## CONCLUSION

The evidence as set forth above and the reasonable inferences to be drawn from this evidence were sufficient to permit the jury to find: (1) the existence of a conspiracy to possess with intent to distribute 1,000 kilograms and more of marijuana; and (2) a link between Mendoza and that conspiracy. The Court thus cannot find that the evidence was insufficient to sustain the conspiracy conviction against Mendoza. Accordingly, Mendoza's motion for a judgment of acquittal must be denied.

**IT IS SO ORDERED.**

**DATED** this 2nd day of May, 2005.

_____
MARTHA VAZQUEZ
CHIEF UNITED STATES DISTRICT JUDGE

Attorneys for Plaintiff:
Ken Gonzales
John G. Crews, III
Richard Williams

Attorney for Defendant Jose Francisco Diaz
Anthony White
Attorney for Defendant Jessica Mendoza
Howard Anderson
Attorney for Defendant Jorge Torres-Laranega
Marcia Milner
Attorney for Martin Mendivil
Ken Del Valle